**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| GEORGE G. LEVIN and FRANK J. PREVE, | ) ) |
| Defendants. | ) ) |
| _____ | ) |

**COMPLAINT**

Plaintiff Securities and Exchange Commission alleges as follows:

**I. INTRODUCTION**

1.      From at least July 2008 to October 2009, George Levin and Frank Preve defrauded investors in raising funds to purchase purported legal settlements from now-convicted Ponzi schemer Scott Rothstein.  Rothstein perpetrated a massive Ponzi scheme through the sale of fake discounted settlements utilizing his law firm Rothstein, Rosenfeld and Adler, PA ("RRA").  Levin and Preve sold promissory notes and created a feeder fund to funnel investor capital to Rothstein, ultimately becoming his largest source of capital.  With their fate tied to Rothstein, Levin and Preve's settlement purchasing business collapsed along with the Ponzi scheme in October 2009.

2.      Levin and Preve first raised money to purchase Rothstein settlements by offering investors promissory notes issued by Levin's company, Banyon 1030-32, LLC.  In 2009, they formed a private investment fund called Banyon Income Fund, LP that invested exclusively in Rothstein's settlements, and for which Banyon 1030-32 served as the general partner.  Levin

controlled them both and Preve operated them.  Each profited from the amount which the settlement discounts they obtained from Rothstein exceeded the rate of return promised to investors.

3.     In soliciting funds to invest in Rothstein's settlements, Levin and Preve distributed the offering materials to investors for the Banyon 1030-32 promissory notes and Banyon Income Fund.  The materials for both contained material misrepresentations and omissions.  Levin and Preve drafted or participated in the drafting of the offering materials for both entities, and Levin had ultimate authority over their content.  Among other things, these offering materials represented to investors that prior to any settlement purchase, Banyon 1030-32 would obtain certain documentation regarding the settlements to ensure the safety of the investments.  Levin and Preve, however, knew or were reckless in not knowing that Banyon 1030-32 often purchased settlements from Rothstein without obtaining any documentation whatsoever.

4.     Furthermore, Banyon Income Fund's private placement memorandum ("PPM") misrepresented that the fund would be a continuation of a successful business strategy pursued by Banyon 1030-32 during the prior 2½ years.  The PPM stated that Banyon 1030-32 had purchased more than $1 billion in Rothstein settlements, had already collected half of that amount, and was due more than $550 million in receivables from previously purchased settlements.

5.     However, Levin and Preve failed to disclose that by the time the Banyon Income Fund offering began in May 2009, Rothstein had already ceased making payments on a majority of the settlements Levin and his entities had purchased.  They also failed to inform investors that

Levin's ability to recover his prior investments from Rothstein was contingent on his ability to raise at least $100 million of additional funding to purchase more settlements from Rothstein.

6.      Through their conduct, the Defendants each violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a), 77e(c), and 77q(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  Unless permanently enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws.

## II.  DEFENDANTS AND RELATED PARTIES

### A.      Defendants

7.      **Levin**, 71, resides in Fort Lauderdale, Florida.  He was the managing member of several entities involved in investments with Rothstein, including Banyon 1030-32.

8.      **Preve**, 68, resides in Plantation, Florida.  He managed the day-to-day operations of Levin's investments in Rothstein's Ponzi scheme.

### B.      Related Parties

9.      **Rothstein**, 49, is currently serving fifty years in federal custody for operating his massive Ponzi scheme.  Rothstein was an attorney licensed by the State of Florida until he was permanently disbarred on November 25, 2009.

10.      **RRA** was a prominent law firm based in Fort Lauderdale, Florida.  Rothstein was a founding partner in the firm and utilized the firm in his Ponzi scheme.  RRA has disbanded and been forced into bankruptcy due to Rothstein's scheme.   RRA's affairs are handled by a bankruptcy trustee overseeing the firm's dissolution.

11.      **Banyon 1030-32** is a Nevada limited liability company with its principal place of business in Fort Lauderdale, Florida.  During the relevant time period Levin was the managing

member of Banyon 1030-32, and he and his wife wholly owned it.  Banyon 1030-32 issued promissory notes to raise funds to purchase settlements from Rothstein, and was also the general partner of Banyon Income Fund.

12.     **Banyon Income Fund** is a Delaware limited partnership with its principal place of business in Fort Lauderdale, Florida.  Banyon Income Fund is an investment fund whose entire portfolio of investments was settlements purchased from Rothstein.

### III.  JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a), and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

14.     The Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because many of the acts and transactions constituting the violations alleged in this complaint occurred in the Southern District of Florida.  Additionally, Levin and Preve both reside in the District.

15.     In connection with the conduct alleged in the complaint, the Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce or the mails.

### IV.  BACKGROUND

#### A.     Rothstein's Ponzi Scheme

16.     Beginning in 2005, Rothstein began offering others the opportunity to purchase purported legal settlements at a discount.  Rothstein falsely claimed to represent plaintiffs who had reached confidential settlements in sexual harassment, whistle-blower, and qui tam actions against large corporate defendants.

-4-

17.     Rothstein explained to prospective purchasers that the defendants had deposited the full amount of the settlements in RRA trust accounts for the benefit of the plaintiffs, but the settlement agreements required that the plaintiffs be paid out in periodic payments to ensure the plaintiffs' compliance with the settlements' confidentiality terms.   Rothstein claimed the plaintiffs were willing to assign their settlement payments from the RRA trust accounts in exchange for a discounted, immediate cash payment.  For example, Rothstein sold one individual the right to receive a $450,000 settlement paid out in three monthly $150,000 payments for an immediate payment of $375,000.

18.     Contrary to Rothstein's representations, there never were any legal settlements and the plaintiffs and defendants did not exist.  In classic Ponzi fashion, Rothstein simply used the funds paid to purchase the settlements to make the purported settlement payments that were due to other investors and to support his lavish lifestyle.  At the end of October 2009, Rothstein's scheme collapsed, and shortly thereafter he surrendered to federal authorities.  He pled guilty to federal charges related to the operation of the Ponzi scheme and was sentenced to fifty years in federal custody.

**B.     Levin and Preve Offer Investors Promissory Notes Through Banyon 1030-32**

19.     Levin first met Rothstein in early 2007 and soon began to personally invest in his discounted legal settlements.  As the number and dollar amount of Levin's settlement purchases increased, he began using one of his dormant legal entities, Banyon 1030-32, to purchase the settlements.  Preve, who was already working for Levin, handled the paperwork related to these purchases.

20.     Preve and Rothstein developed a document package to accompany each settlement Banyon 1030-32 purchased.  The document package consisted of:

a) a copy of the executed settlement and confidentiality agreements between the plaintiff and defendant, with the names and contact information of the plaintiff and defendant redacted;

b) a copy of the bank wire confirmation or bank balance summary evidencing that the defendant had fully funded the settlement in an RRA trust account; and

c) a documented assignment of the plaintiff's rights to the settlement payments to Banyon 1030-32 in exchange for an immediate payment.

21.    Due to the confidential nature of the settlements and Rothstein's control of the documentation, the document package was the only information Levin and Preve received regarding the settlements.

22.    Within a few months, Levin had purchased approximately $1.7 million in settlements, but Rothstein's demand for settlement funding continued to grow.   Levin accordingly began pursuing outside investors to look for other sources of capital.   In December 2007, Levin, through Banyon 1030-32, started offering investors promissory notes with the stated purpose of purchasing discounted legal settlements from Rothstein.

23.    Preve drafted the promissory notes, and Levin executed them on behalf of Banyon 1030-32.  The notes provided investors with scheduled payments at fixed interest rates ranging from 12% to 30% per year, with most ranging from 18% to 20%.  The term of the notes was generally 180 days.  Banyon 1030-32 used the proceeds from the promissory notes to purchase settlements from Rothstein and profited from the higher rate of return it earned on the purchased settlements over the interest rate it paid under the promissory notes.

24.    Levin and Preve initially marketed the promissory notes to their friends and acquaintances.  As word spread, they contacted more and more potential investors and lured

them into purchasing the promissory notes. They explained to investors how the notes represented a business opportunity allowing investors to take advantage of legal settlements. All the investor had to do to participate was invest in the notes through Levin and Preve.

25.     Levin and Preve marketed the notes to investors as a minimal risk investment promising large returns. Specifically, they prepared a PowerPoint presentation describing Banyon 1030-32's "low risk investment strategy" and its "risk mitigation factors." As the managing member of Banyon 1030-32 Levin had ultimate authority over the content of the PowerPoint presentation.

26.     This PowerPoint, which they generally showed to investors, described the "document flow" of the settlement purchase and indicated the order in which the documents will be executed and received. The PowerPoint explicitly stated that "100% of the settlement funds cover [sic] by the Settlement Agreement are wired to and received by the [RRA trust account] before any disbursements are made by [Banyon 1030-32 to purchase the settlements]." Additionally, the PowerPoint stated Banyon 1030-32 "will have all executed documents necessary to access [the settlement funds] BEFORE any disbursements are made."

27.     Despite these representations to investors, from at least July 2008, Preve, who primarily handled the day-to-day operation of the purchases, often purchased settlements from Rothstein prior to receiving confirmation that the settlement funds had been wired into an RRA trust account. Furthermore, as a matter of course, Preve purchased settlements from Rothstein without any executed documents.

28.     Numerous e-mails beginning in the summer of 2008 through the collapse of the scheme indicate Preve knowingly purchased settlements from Rothstein without the required documentation. In one e-mail in July 2008, Preve writes: "Missing documents....these won't go

away so someone needs to do them...........you are also holding up our audit because I can't show anyone that I am a complete idiot by sending out millions of dollars with nothing to show for it except some e-mails that say 'Hey, Guido, send me 5 Mill.........I have such a deal for you.'"

29.     Levin, as the managing member of Banyon 1030-32 and personal guarantor of all promissory notes issued, often dealt directly with Rothstein in connection with the purchase of the settlements.   He knew or was reckless in not knowing Preve was not effectively implementing the procedural safeguards they had represented to investors.   For example, Preve told Levin that he was not receiving documentation for purchased settlements so Levin could address it with Rothstein.

30.     Between December 2007 until Rothstein's Ponzi scheme collapsed in October 2009, Banyon 1030-32, through the issuance of the promissory notes, raised more than $57 million from 90 investors to purchase Rothstein settlements.

31.     No registration statement covering the promissory notes was filed or in effect with the Commission throughout this time period.   No exemption from registration existed with respect to the promissory notes because investors who were unsophisticated and unaccredited purchase them.

32.     Many investors rolled over their promissory notes into new investments each time they came due, and thus remained invested through the collapse of the Ponzi scheme.   While some investors cashed out their principal and interest during the scheme, Banyon 1030-32's promissory note investors overall lost approximately $40 million.

C.     **Rothstein's Scheme Begins to Falter**

33.     While continuing to issue promissory notes through Banyon 1030-32, Levin and Preve also obtained additional financing to purchase Rothstein's settlements.   Between April and

November 2008, Levin, through separately created entities, entered into credit and security agreements with three New York based hedge funds. The hedge funds agreed to provide these associated Levin entities with lines of credit at fixed interest rates to purchase settlements from Rothstein.

34.     In December 2008, Levin and Preve began purchasing fewer settlements from Rothstein because the hedge funds were not approving full use of the lines of credit. As the three hedge funds decreased funding, Rothstein began to miss scheduled settlement payments to the associated Levin entities in early 2009. Rothstein complained to Levin and Preve about their decreasing settlement funding, claiming he had convinced his clients to settle with the promise of immediate funding and now he could not satisfy the promise of immediate payments to his clients.

35.     Rothstein further told Levin and Preve their inability to provide him with settlement financing had now caused him problems with the Florida Bar Association and put his law license in jeopardy. Rothstein claimed that his clients, the purported plaintiffs, had filed complaints with the Florida Bar because he was unable to provide them with the promised immediate payments for their settlements. Rothstein further explained that as a result he could be disbarred, which would be the end of the settlement fund arrangement he had with Levin.

36.     Rothstein claimed to have told the Florida Bar he would suspend payments out of the RRA trust accounts so the Bar would not take further action. The only way he could resume making payments, Rothstein said, was for Levin and Preve to provide him with approximately $100 million to fund the commitments he supposedly had already made to plaintiffs.

37.     By mid April 2009, Rothstein had ceased payments on a majority of the settlements the associated Levin entities had purchased, and the hedge funds had stopped advancing any money under the lines of credit.

38.     With the RRA trust accounts locked up, Levin's investment strategy had ground to a halt.  Levin and Preve believed the only way to resume the investment strategy was to raise the additional $100 million Rothstein needed to meet his supposed existing commitments to his clients.

      **D.**    **Levin and Preve Establish an Investment Fund**

39.     In early 2009, in an effort to replace the then decreasing funding from the hedge funds, Levin and Preve began the process of establishing an investment fund to raise money to invest in Rothstein's settlements.  Levin and Preve, with the help of a Philadelphia investment adviser, established Banyon Income Fund with the idea that the adviser would solicit his clients and others to invest in the fund.  Between May and October 2009, they together raised approximately $100 million for Banyon Income Fund from approximately 83 investors.

40.     Banyon Income Fund was set up as a limited partnership with Banyon 1030-32 serving as the general partner.  As the managing member of Banyon 1030-32, Levin had ultimate authority over the operations and statements of Banyon Income Fund.  Banyon Income Fund's stated purpose was "to purchase, at a discount, settlements and related periodic revenue stream[s]… from individual plaintiffs" who had settled lawsuits or claims and "would otherwise receive their settlement amounts over a period of time."  The PPM stated that Banyon Income Fund "will be continuing a business strategy that [Banyon 1030-32] and its affiliates have been engaged in for approximately 2.5 years."  The PPM touted that as of March 31, 2009, Banyon

1030-32 had successfully purchased more than $1 billion in settlements from Rothstein, almost half of which had already been repaid.

41.     The Fund's offering materials guaranteed investors annual returns of 12% to 15%, and indicated the general partner would retain any profits remaining from the purchase of settlements after paying all commitments to limited partners.

42.     The PPM stated Banyon Income Fund's "intended goal is to minimize risk while providing limited partners with the Preferred Return."  The PPM described the "essential steps" in the settlement purchase process, indicating Banyon Income Fund would receive an assignment of the settlement and related revenue stream prior to Banyon Income Fund issuing a check to purchase a settlement.  Additionally, the PPM explicitly stated, "Prior to purchase by [Banyon Income Fund], the full settlement amount to be paid on each Purchased Settlement will have been deposited in a trust account … and the right to receive distributions out of the trust account will be assigned to [Banyon Income Fund]."

43.     The Banyon Income Fund PPM also provided that the settlement would undergo a verification process.  This process purportedly consisted of an independent third-party verifier reviewing the unredacted settlement documents to ensure that the plaintiff and defendant had each executed the agreement.  Moreover, the third-party verifier would supposedly review the RRA trust account balances to verify the defendants had deposited the full settlement amount and the plaintiffs had received their lump sum payments.

44.     Contrary to the representations in the PPM, Banyon Income Fund repeatedly purchased settlements without obtaining the proper documentation, including a confirmation that the defendant had wired the full settlement amount into an RRA trust account and a documented assignment of the right to receive the settlement proceeds.  For example, Preve e-mailed

Rothstein on September 22, 2009 stating "can we at least get the documents for the monies that have been sent so if we do have public scrutiny over the [Banyon Income Fund] books we have things balanced rather than the cavernous hole that I have allowed to be created?"  By the end of the third quarter of 2009, Banyon Income Fund had funded approximately $140 million in settlement purchases, including reinvested funds, but lacked documentation for approximately $40 million of those purchases.

45.     In addition, by at least late September 2009, Levin and Preve both knew the independent verifier had not verified settlements purchased since July 2009.  They also knew the verifier could not verify settlements that were missing documentation.

46.     Moreover, contrary to the representations in the PPM of Banyon Income Fund's continuation of Banyon 1030-32's successful settlement investment strategy and the payments already collected, Levin and Preve knew and failed to disclose Rothstein had already ceased making payments on previous settlements.  By the time the PPM was finalized and Banyon Income Fund received its first investment in early May 2009, Rothstein was not making any payments on a majority of the settlements the Levin entities had purchased.  In the months following, while Levin and Preve were still raising money for Banyon Income Fund, Rothstein withheld payments on additional settlements Banyon 1030-32 purchased.

47.     Finally, Levin and Preve failed to disclose the need to raise $100 million from new investors just to get Rothstein to resume making payments on the amounts previously invested, because of Rothstein's supposed commitment to the Florida Bar.

**E.     Rothstein's Ponzi Scheme Collapses**

48.     The additional investments from Banyon Income Fund provided Rothstein with only a temporary reprieve on his collapsing Ponzi scheme.  The $100 million Rothstein

previously claimed he needed to fulfill his prior commitments to plaintiffs turned into an elusive, moving target as he continued to demand more funding from Levin and Preve.  By the end of October 2009, Rothstein's Ponzi scheme collapsed when he was no longer able to make any payments.  Absent the payouts from the RRA trust accounts, Banyon Income Fund was unable to meet its commitments to its investors and ceased to operate.

49.     At the time of the collapse of Rothstein's Ponzi scheme, Banyon Income Fund investors had only received approximately $2 million in interest payments, and investors who purchased promissory notes from Banyon 1030-32 had lost approximately $40 million.

<u>COUNT I</u>

**Sale of Unregistered Securities in Violation of**
**<u>Sections 5(a) and (c) of the Securities Act</u>**
**(Levin and Preve)**

50.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions issued by Banyon 1030-32 described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

52.     From at least July 2008 through October 2009, the Defendants directly and indirectly:

(a)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise;

(b)     carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

      (c)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

53.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Fraud in Violation of
### Section 17(a)(1) of the Securities Act
### (Levin and Preve)

54.     The Commission repeats and realleges Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

55.     From at least July 2008 through October 2009, Levin and Preve, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

56.     By reason of the foregoing, Levin and Preve directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud in Violation of
### Sections 17(a)(2) and 17(a)(3) of the Securities Act
**(Levin and Preve)**

57.     The Commission repeats and realleges Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

58.     From at least July 2008 through October 2009, Levin and Preve, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon purchasers and prospective purchasers of such securities.

59.     By reason of the foregoing, Levin and Preve directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) of the
### Exchange Act and Rule 10b-5
**(Levin)**

60.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

61.     From at least July 2008 through October 2009, Levin, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly:  (a) employed devices,

schemes or artifices to defraud; (b) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

62.     By reason of the foregoing, Levin directly and indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Securities Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

<u>**COUNT V**</u>

**Aiding and Abetting Violations**
<u>**of Section 10(b) and Rule 10b-5(b) of the Exchange Act**</u>
**(Preve)**

63.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

64.     From at least July 2008 through 2009, Levin, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

65.     Preve, from at least July 2008 through 2009, knowingly or recklessly substantially assisted Levin's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

66.     By reason of the foregoing, Preve, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT VI

### Aiding and Abetting Violations
### of Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Levin and Preve)

67.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

68.     From at least July 2008 through 2009, Banyon 1030-32 and Banyon Income Fund, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

69.     Levin and Preve, from at least July 2008 through 2009, knowingly or recklessly substantially assisted Banyon 1030-32's and Banyon Income Fund's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

70.     By reason of the foregoing, Levin and Preve, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine and find that Levin and Preve committed the violations of the federal securities laws alleged in this Complaint.

## II.

### Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining Levin and Preve from directly or indirectly violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## III.

### Disgorgement

Issue an Order finding Levin liable and setting the amount he will be required to pay to disgorge all ill-gotten profits or proceeds he received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

Issue an Order requiring Preve to disgorge all ill-gotten profits or proceeds he received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

## IV.

### Penalties

Issue an Order finding Levin liable and setting the amount of civil money penalties he will be required to pay pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

Issue an Order directing Preve to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## V.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VI.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated:  May 22, 2012                         Respectfully submitted,


By:      s/ James M. Carlson
         James M. Carlson
         Senior Trial Counsel
         S.D. Florida Bar # A5501534
         Direct Dial:  (305) 982-6317
         E-mail:  carlsonja@sec.gov

         Attorney for Plaintiff
         **SECURITIES AND EXCHANGE**
         **COMMISSION**
         801 Brickell Avenue, Suite 1800
         Miami, Florida  33131
         Telephone: (305) 982-6300
         Facsimile:  (305) 536-4154