# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 12-21917-CIV-ROSENBAUM/SNOW

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

GEORGE G. LEVIN and FRANK J. PREVE,

        Defendants.

_____/

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS
## THE AMENDED COMPLAINT

This matter is before the Court on Defendant Frank Preve's Motion to Dismiss Plaintiff's Amended Complaint [D.E. 95] and Motion of Defendant George G. Levin to Dismiss the Amended Complaint [D.E. 94]. The Court has reviewed the Amended Complaint, both Motions, and the supporting and opposing filings, and is otherwise fully advised in the premises. For the reasons set forth below, the Court denies both Motions.

## I. BACKGROUND

On January 27, 2010, former attorney Scott W. Rothstein pled guilty to various charges stemming from his direction of a $1.2 billion Ponzi scheme[1] from his position as a shareholder, chairman, and the chief executive officer of the law firm of Rothstein, Rosenfeldt and Adler, P.A.

---

[1] A Ponzi scheme, generally, "is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *United States v. Ward*, 486 F.3d 1212, 1214 n.1 (11th Cir. 2007) (citation and internal quotation marks omitted). It is named after Charles Ponzi, an infamous Boston swindler. *Id.*

Among other aspects of this scheme, Rothstein solicited victim investors to purchase discounted purported confidential settlement agreements.  Rothstein represented these settlement agreements to have been entered into between plaintiffs and defendants in settlement of legal claims and falsely advised victim investors that their monies would be used to pay the plaintiffs a discounted percentage of the settlement award immediately in exchange for the victim investors' rights to receive the entirety of the supposed settlement award over time.  The Securities and Exchange Commission's ("SEC") enforcement action against Defendants Preve and Levin in this case arises out of Defendants' alleged involvement in selling securities tied to the fictional legal settlements at the heart of Rothstein's Ponzi scheme.

### A. Banyon 1030-32

According to the SEC,[2] Levin began personally investing in the purported Rothstein settlements in 2007.  D.E. 86 at ¶ 19.  As his investments grew, Levin began using Banyon 1030-32 ("Banyon"), a Nevada limited liability company with its principal place of business in Florida, wholly owned by Levin and his wife, to purchase settlements from Rothstein.  *Id.* at ¶¶ 11, 19.

For each settlement that Banyon bought, the SEC avers that Preve and Rothstein created a "document package" that included a redacted copy of the (fictitious) settlement agreement, a document indicating that the supposed settlement-defendant had fully transferred the settlement funds to Rothstein's firm's trust account, and a document assigning the ostensible settlement-plaintiff's rights to Banyon.  *Id.* at ¶ 20.

---

[2] The information contained in this section comes from the SEC's Amended Complaint in this action.  On a motion to dismiss, the Court accepts the non-conclusory allegations as true and views them in the light most favorable to the plaintiff.  *See, e.g.*, *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011).

Beginning in December 2007, Levin—through Banyon—began offering investors promissory notes, drafted by Preve and executed by Levin on behalf of Banyon, with the stated purpose of using the funds collected to purchase discounted settlements from Rothstein.  *Id.* at ¶¶ 22-23.  According to the SEC, these promissory notes were not registered with the SEC, and no registration exemption applied because they were purchased by "unsophisticated and unaccredited" investors.  *Id.* at ¶ 34.

The notes were marketed to friends and acquaintances of Levin and Preve as well as to other investors.  *Id.* at ¶ 24.  As part of this marketing effort, Preve prepared a PowerPoint presentation—of which multiple versions exist—that Levin and Preve then showed and distributed to investors.  *Id.* at ¶ 25.  Between at least March and July 2008, the presentation was sent to various investors, each time touting Banyon's "High Yield Low Risk Investment Strategy."  *Id.* at ¶¶ 25-27.  Each of these recipients subsequently invested in Banyon. *Id.*

Among the examples of presentations resulting in substantial investments, the Amended Complaint cites the following:  Two trustees and a Delaware company invested $4 million in Banyon after they received a Banyon PowerPoint presentation dated March 3, 2008, on a date that the Amended Complaint does not set forth.  *Id.* at ¶ 27.  In May 2008, an investor who ultimately invested approximately $500,000 in Banyon received a Banyon PowerPoint presentation entitled, "A High Yield Low Risk Investment Strategy."  *Id.*  Another couple of months later, on July 18, 2008, an investor received a Banyon PowerPoint presentation entitled "A High Yield Low Risk Investment Strategy" and invested approximately $7 million in Banyon.  *Id.* at ¶ 25.  Similarly, on July 22, 2008, Levin and Preve showed a PowerPoint presentation to one potential investor in Levin's office.  *Id.* at ¶ 26.  The presentation described the "document flow" of the settlement purchase and indicated the order in which the documents would be executed and received.  It also

-3-

contained the following pertinent statements:

> 100% of the settlement funds cover [sic] by the Settlement Agreement are wired to and received by the [RRA trust account] before any disbursements are made by [Banyon 1030-32 to purchase the settlements];

and

> [Banyon 1030-32] will have all executed documents necessary to access [the settlement funds] BEFORE any disbursements are made.

*Id.* at ¶ 26 (additions in Amended Complaint) (internal quotation marks omitted). These representations were also a part of the presentation to the two trustees and the Delaware company that invested $4 million after reviewing the presentation dated March 3, 2008. *Id.* at ¶ 27.

The SEC alleges that Preve participated in drafting the PowerPoint presentations and that Levin, as "the managing member" of Banyon, had "ultimate authority over the content" of the presentation. *Id.* at ¶ 28-29.

Despite the representations made in the PowerPoint presentation, beginning no later than July 2008, the SEC claims, Preve actually purchased "settlements" from Rothstein before receiving any confirmation that funds were wired to the trust account and any executed documents from Rothstein. *Id.* at ¶ 30. Further, the SEC alleges that Levin knew that Preve had not received confirmation of funds or executed documents, contrary to what had been represented to investors. *Id.* at ¶ 32.

With respect to Defendants' knowledge of the ongoing fraud, the SEC points to an email written by Preve to Rothstein on July 11, 2008.[3] In this email, Preve complains to Rothstein that he

---

[3]As a general rule, courts may consider only matters within the four corners of the complaint in deciding a motion to dismiss. Where, however, the plaintiff "refers to certain documents in the complaint and those documents are central to the plaintiff's claim, the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6)." *Brooks v. Blue Cross & Blue Shield of Florida*, 116 F.3d 1364, 1369 (11th Cir 1997). The email from Preve to Rothstein was attached to Levin's Motion to Dismiss [D.E. 94-1]. Because the SEC relies on the email to show Preve's

does not have the required settlement documentation:

> Missing documents . . . these won't go away so someone needs to do them . . . you are also holding up the audit because I can't show anyone I am a complete idiot by sending out millions of dollars with nothing to show for it except some emails that say "Hey, Guido, send me 5 Mill . . .I have such a deal for you . . . ."

*Id.* at ¶ 31. As for Levin's knowledge, the SEC avers that he, as Banyon's managing member and the personal guarantor of all the promissory notes issued, often dealt directly with Rothstein in connection with the settlement purchases. *Id.* at ¶ 32. According to the Amended Complaint, Levin knew that Preve was not implementing the procedural safeguards that Defendants had represented to investors, and Preve informed Levin that Preve was not receiving the pertinent documentation so that Levin could address the issue with Rothstein. *Id.* Thus, the SEC maintains, Defendants were aware that their representations to Banyon investors were false. In all, Banyon raised more than $57 million from ninety investors nationwide who purchased the promissory notes. *Id.* at ¶ 33.

Throughout this period, the SEC contends, no registration statement covering the promissory notes was filed or in effect with the SEC. *Id.* at ¶ 34. Nor, the Amended Complaint continues, did any exemption for registration exist with regard to the promissory notes because the investors who purchased the promissory notes were "unsophisticated and unaccredited," and Levin and Preve offered the securities in multiple states through a public offering exceeding $5 million. *Id.* Adding to the financial casualties of the scheme, the Amended Complaint asserts, many investors rolled over their promissory notes into new investments each time the notes came due. *Id.* at ¶ 35. As a result, many investors remained invested through the collapse of the Ponzi scheme, causing an overall loss to the investors of approximately $40 million. *Id.*

---

knowledge of the purported fraud, the Court has considered the attachment in resolving the Motions.

## B. Banyon Income Fund

In addition to the Banyon activities, the SEC alleges that Levin and Preve raised additional funds to purchase Rothstein settlements through the Banyon Income Fund ("BIF"). More specifically, the SEC avers that, between April and November 2008, Levin, through separately created entities, entered into agreements with New York-based hedge funds to obtain lines of credit to purchase settlements. *Id.* at ¶ 36.

In December 2008, the hedge funds began restricting the lines of credit, causing Levin and Preve to purchase fewer settlements and, as a result, Rothstein to miss payments. *Id.* at ¶ 37. Rothstein complained to Levin and Preve about the lack of funds and told them that he faced disbarment, as his clients had allegedly filed complaints with the Florida Bar because of Rothstein's inability to provide his supposed clients, the purported plaintiffs who had entered into the settlement agreements that Rothstein claimed to have been the subjects of the promissory-note funding, with their promised payments. *Id.* at ¶ 38. In addition, Rothstein advised Preve and Levin that he had informed the Florida Bar that he would suspend payments from his trust accounts so the Bar would not take further action. *Id.* at ¶ 39. Rothstein further claimed to Levin and Preve that he could resume the payments only if they provided him with $100 million. *Id.* at ¶ 39.

In early 2009, therefore, Levin and Preve, together with a Philadelphia investment adviser, established BIF as an investment fund to raise the $100 million to invest in the settlements. *Id.* at ¶ 42. BIF was created as a limited partnership with Banyon as its general partner. *Id.* at ¶ 43. Thus, the SEC alleges, Levin had "ultimate authority over the operations and statements" of BIF because he was the managing member of Banyon. *Id.*

The private placement memorandum ("PPM") for BIF represented that as of March 31, 2009,

Banyon had successfully purchased more than $1 billion in settlements from Rothstein and that almost half of the settlements had been repaid.  *Id.*  Stating that BIF's intended goal was to "minimize risk," the PPM explained the "essential steps" in the settlement purchase process, indicating that BIF would receive an assignment of the settlement and related revenue stream prior to BIF's issuance of a check to purchase a settlement.  *Id.* at ¶ 45.  In this regard, the PPM promised,

> Prior to purchase by [Banyon Income Fund], the full settlement amount to be paid on each Purchased Settlement will have been deposited in a trust account . . . and the right to receive distributions out of the trust account will be assigned to [Banyon Income Fund].

*Id.* at ¶ 45. (alterations in Complaint) (internal quotation marks omitted).  Additionally, the PPM described a verification process that would be conducted by an independent third-party verifier to ensure that the settlement was valid and that the funds had been deposited in the trust account.  *Id.* at ¶ 46.

Conspicuously absent from the PPM, however, the SEC asserts, was any indication that by mid-April 2009 — before the PPM was finalized and BIF had received is first investment in early 2009, Rothstein had "ceased payments on a majority of the settlements the associated Levin entities had purchased," *id.* at ¶¶ 40, 49, or that Rothstein had made further payment on the previously purchased settlements contingent on Levin and Preve's raising of $100 million.  *Id.* at ¶¶ 49-50.  Although Levin and Preve continued to raise money for BIF, Rothstein withheld payments on additional Banyon settlements in the months following.  *Id.* at ¶ 50.

Furthermore, despite the PPM's representations, the Amended Complaint continues, BIF purchased settlements without obtaining documentation, including a confirmation that the alleged settlement-defendants had wired the full settlement amounts in to an RRA trust account and a

documented assignment of the right to receive settlement proceeds.  *Id.* at ¶ 47.  And Preve and

Levin allegedly knew of these facts.  Indeed, the Amended Complaint quotes a September 22, 2009,

email from Preve to Rothstein, asking, "[C]an we at least get the documents for the monies that have

been sent so if we do have public scrutiny over the [Banyon Income Fund] books we have things

balanced rather than the cavernous hole that I have allowed to be created?"  *Id.* (alterations in

Amended Complaint).  According to the SEC, by no later than late September 2009, Levin and Preve

also knew that the third-party verifier could not verify settlements missing documentation and that

the verifier had not verified settlements purchased by BIF since July 2009.  *Id.* at ¶ 48.

Between May and October 2009, BIF raised $100 million from approximately eighty-three

investors.  *Id.* at ¶ 42.  Using this money and reinvested funds, by the end of the third quarter of

2009, BIF funded a total of approximately $140 million in settlement purchases, but it lacked

documentation for approximately $40 million of those purchases.  *Id.* at ¶ 47.  After the collapse of

Rothstein's scheme in October 2009, BIF was unable make payments to its investors and ceased

operations.  *Id.* at ¶ 54.

### C. The Amended Complaint

The SEC filed its initial Complaint on May 22, 2012.  D.E. 1.  Defendants subsequently filed

motions to dismiss that were granted in part by this Court on February 14, 2013.  *See* D.E. 83.  The

SEC was granted leave to amend its pleading and subsequently filed its Amended Complaint.  *See*

D.E. 86.

The six-count Amended Complaint alleges that both Levin and Preve violated Sections 5(a)

and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c), by selling unregistered securities (Count I);

committed fraud in violation of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15

U.S.C. §§ 77q(a)(1)-(3) (Counts II and III); and aided and abetted violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), by Banyon 1030-32 and the Banyon Income Fund (Count VI).  The SEC also asserts that Levin committed fraud in violation of Section 10(b) and Rule 10b-5 (Count IV) and that Preve aided and abetted Levin's Section 10(b) and Rule 10b-5 alleged violations (Count V).  *Id.* ¶¶ 55-75.  As remedies, the SEC seeks declaratory and injunctive relief, disgorgement, and civil penalties against both Defendants. *Id.* at 17-18.

## II. LEGAL STANDARDS

### A. General Pleading Requirements under Rule 8, Fed. R. Civ. P.

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").  Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). The Supreme Court has emphasized "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion to dismiss, a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the

plaintiff.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002). Upon engaging in this analysis, a court should deny a motion to dismiss where the pleading asserts non-conclusory, factual allegations, that, if true, would push the claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570) (internal quotation marks omitted); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570) (explaining that allegations in a complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"). A claim is facially plausible when the plaintiff's factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B. Heightened Pleading Requirements of Rule 9(b), Fed. R. Civ. P.

Additionally, Rule 9(b), Fed. R. Civ. P., imposes a heightened pleading standard for causes of action asserting fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The purpose of this particularity requirement is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted).   Rule 9's heightened pleading standard also applies to securities-related fraud cases brought by the SEC. *SEC v. Solow*, No. 06-81041, 2007 WL 917269, at *2 (S.D. Fla. Mar. 23, 2007).

Rule 9(b) may be satisfied if a plaintiff sets forth

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each statement and the person responsible for making (or, in

> the case of omissions, not making) [them], and (3) the content of such
> statements and the manner in which they misled the plaintiff, and (4)
> what the defendants "obtained as a consequence of the fraud."

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997). These factors are not exclusive, however, and a plaintiff may satisfy Rule 9(b)'s particularity requirements through alternative means. *Id.* (citing *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988).

It is true that Rule 9's particularity requirements must be read in conjunction with Rule 8 "so as not to abrogate the concept of the notice pleading." *Degirmenci v. Sapphire-Fort Lauderdale, LLLP*, 693 F. Supp. 2d 1325, 1344 (S.D. Fla. 2010) (quoting *Durham*, 847 F.2d at 1511). Nevertheless, because fair notice is the most basic consideration underlying Rule 9(b), a complaint must reasonably notify the defendant of his or her purported role in the scheme and, in cases involving multiple defendants, the complaint must inform each defendant of his or her alleged role in the fraud. *Brooks*, 116 F.3d at 1381 (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994)).

### III. DEFENDANTS' MOTIONS TO DISMISS

Defendants argue that the Amended Complaint should be dismissed for several reasons. First, Defendants contend that the Amended Complaint does not satisfy the heightened pleading standard under Rule 9(b). Second, they maintain that the SEC fails to state a claim under Counts II through VI because the Amended Complaint does not establish the requisite elements of misrepresentation, materiality, and scienter. Third, Defendants urge that the SEC has failed to allege any primary or secondary violation under Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. And finally, Defendant Preve asserts that Count I of the Amended Complaint should

be dismissed because the securities at issue are exempt from registration under the Securities Act.

### A. Rule 9(b) Pleading Requirements

In their respective motions to dismiss, Defendants argue that the SEC's Amended Complaint still fails to meet Rule 9(b)'s heightened pleading standard.[4]  The Court dismissed the SEC's initial Complaint in part because of its deficiencies with respect to Rule 9(b)'s particularity requirement. *See* D.E. 83.  First, the Court concluded that the Complaint failed to specify which set of facts supported each count.  Second, it was unclear whether the SEC predicated Levin's liability on his preparation of the PowerPoint presentation or on the fact that he had "ultimate authority" over its content.  And third, the Complaint lacked specific allegations regarding when the PowerPoints were presented, thus creating a question of whether the statements at issue were in fact misrepresentations at the times that they were made.  Because the allegations did not provide Defendants adequate notice of the bases underlying the SEC's claims, the Court directed the SEC to replead Counts II through VI. *Id.*

The Court is satisfied that the SEC has cured all deficiencies that appeared in the original Complaint.  First, the Amended Complaint now specifies which statements and omissions form the basis for each count.  *See* D.E. 86 at ¶¶ 51-52.  In this regard, it clarifies that the statements and omissions related to both the Banyon and BIF endeavors support liability under Counts II, III, and VI; Levin's authority over the content of the Banyon PowerPoints and BIF's operations and statements supports liability under Count IV; and those same facts support liability for Count V. *Id.*

---

[4]In its February 14th Order, the Court addressed which counts were subject to Rule 9(b)'s heightened pleading standard.  The counts pled in the Amended Complaint are identical to those set forth in the original.  Accordingly, for the reasons stated in the February 14th Order [D.E.83], Counts II-VI of the Amended Complaint must meet the particularity requirement.

Second, the Amended Complaint now makes clear that Levin's liability is predicated on his "ultimate authority" over the PowerPoint presentations, his knowledge of the material misrepresentations and omissions of material fact, and his ownership and control of Banyon and, ultimately, BIF. *Id.* at ¶ 29. Finally, the Amended Complaint sufficiently clarifies the timing of the making of the alleged material misrepresentations and omissions of material fact to establish, if true, that Defendants knew of the alleged misrepresentations and omissions at the times that they were made. The Court elaborates below on the second and third issues.

### 1. Defendants' Role in the Banyon Fraud

In the pending Motions to Dismiss, Defendants assert that the Amended Complaint still fails to plead the allegations against them with the requisite particularity. In short, Defendants stress that the SEC does not specifically identify who distributed the Banyon PowerPoint presentations and to whom they were disseminated, and it does not specify the times of receipt. The Court does not find merit in these arguments.

Although Rule 9(b) imposes more stringent pleading requirements for plaintiffs asserting fraud claims, courts have generally refused to place these pleadings under too strict a scrutiny. *See, e.g.*, *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (noting that "focusing exclusively on [Rule 9(b)'s] 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."(internal citation omitted)). While Defendants urge the Court to require the SEC to provide more precise details, this is not required as long as the Amended Complaint adequately alerts Defendants of the nature of the misconduct with which they are charged. *See Colonial Penn Ins. Co. v. Value Rent-A-Car, Inc.*, 814 F. Supp. 1084, 1092 (S.D. Fla. 1992) ("To fulfill the particularity requirement, a

complaint must give defendants fair notice of the nature of the claim, notice of the grounds upon which the claim rests, and be based upon a reasonable belief that a wrong has been committed." (quoting *Seville*, 742 F.2d at 791)).

Here, the Amended Complaint accomplishes this function.  It explicitly alleges that both Levin and Preve showed and distributed the PowerPoints to investors.  D.E. 86 at ¶ 86.  It further avers that Preve drafted the presentations and that Levin, as the managing member of Banyon, had ultimate authority over their content.  Moreover, the Amended Complaint contends that Levin knew that Preve was not effectively implementing the procedural safeguards that the two of them had represented to investors because Preve told Levin that he was not receiving documentation for purchased settlements so Levin could address that problem with Rothstein.  Although Defendants find fault with the SEC's failure to specify exactly who gave each presentation described in the Amended Complaint, the Amended Complaint adequately alleges that Defendants were jointly responsible for the content of these materials and for disseminating these materials to investors.  As a result, the SEC has given Defendants sufficient notice regarding the misrepresentations at issue.

Defendants also maintain that the SEC does not describe in adequate detail to whom the presentations were distributed, instead referring to the recipients generally as "investors" or "trustees." *See id.* at ¶¶ 25-27.  These general denominations, however, are enough.  The SEC is not required to plead which particular investors received and relied on the false statements.  Whereas justifiable reliance must be pled in a private enforcement action, it is not an element of an SEC enforcement action.  *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012).  Thus, while the SEC must allege that Defendants made material misrepresentations, it is not required to plead precisely to whom those misrepresentations were made.  The allegations that Levin and Preve

-14-

made presentations containing material misstatements to investors are sufficient to satisfy this threshold.

The Court also disagrees with Defendants' contention that the Amended Complaint does not state with the requisite particularity the time that the presentations were made.  The Amended Complaint lists two specific dates—July 18, 2008, and July 22, 2008—during which PowerPoint presentations were shown to investors.  D.E. 86 at ¶¶ 25-26.  It also avers that one investor received a presentation some time during May 2008 and that one of the presentations was dated March 3, 2008.  *Id.* at ¶ 27.  It is true that the Amended Complaint provides no specific date of receipt for the latter two instances, but the facts alleged do put Defendants on adequate notice of the time frame at issue and the presentations in question.

Finally, Defendants seem to contend that insufficient overlap exists between the time that the Banyon PowerPoint presentations were made and the time that Defendants are purported to have had knowledge of their falsehood.  As a result, Defendants contend that the Amended Complaint contains no sufficient allegation that Defendants actually made any fraudulent representations.  In its February 14th Order, the Court determined that the Complaint failed to adequately allege that Defendants knew that the statements arising from the Banyon offerings were fraudulent when Defendants made them to investors.  The Amended Complaint, however, cures those deficiencies.

According to the Amended Complaint, Levin and Preve showed and distributed PowerPoint presentations to various investors between approximately March and July 2008.  These PowerPoints contained representations advertising Banyon's allegedly low-risk, high-yield investment strategy and described the process by which the settlements were purchased and the funds disbursed.  D.E. 86 at ¶¶ 25-27.  The Amended Complaint further claims that "numerous e[]mails beginning in the

summer of 2008" and continuing through the collapse of the scheme demonstrate that Preve knowingly purchased settlements from Rothstein without the required documentation.  *Id.* at ¶ 31. In particular, the Amended Complaint notes one email sent in July 2008 in which Preve fretted that he had already sent "millions of dollars" to Rothstein with "nothing to show for it except some e[]mails that say 'Hey, Guido, send me 5 Mill . . . I have such a deal for you.'" D.E. 86 at ¶ 31.  In the same email, Preve complained to Rothstein that the "missing documents" would not "go away" and that Preve had had to hold up Banyon's audit in order to cover for the fact that Preve had previously sent out the "millions of dollars" in the absence of documentation.  *Id.*  If true, these allegations unambiguously demonstrate that far enough in advance of the July 2008 email that Preve and Levin could have collected "millions of dollars" and Preve could have repeatedly complained about the missing documents such that Preve alluded to this fact in harping on the issue again, urging that the issue would not "go away," Preve knew that Banyon had no documents supporting the alleged settlements that the monies were supposed to fund.  These contentions sufficiently allege knowledge on Preve's part.

Although presentations were distributed before Preve's July 2008 email, the proximity of the dates and circumstances provided creates a reasonable  inference in favor of the SEC.  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n. 1 (11th Cir.1999)).

Indeed, if Defendants lacked the documentation in July, it makes little sense that they would have had that same documentation in the months immediately preceding.  Furthermore, Preve's

email to Rothstein was dated July 11, 2008.  The Amended Complaint contains a detailed account of a presentation that Levin and Preve gave to investors on July 22, 2008.

Despite Preve's email, Levin argues that the Amended Complaint does not adequately plead his role in the Banyon fraud because he did not write, nor was he copied on, the email sent to Rothstein.  Therefore, he asserts that the SEC has not established his knowledge of the misrepresentations at issue.

The Court respectfully disagrees.  Although, there is no specific date attributed to Levin's knowledge of the false statements, the Amended Complaint sufficiently alleges that Levin was aware that his company was purchasing settlements from Rothstein without the documentation that it had advertised to investors.  The Amended Complaint makes the following allegations:

> 32.    Levin, as the managing member of Banyon1030-32 and personal guarantor of all promissory notes issued, often dealt directly with Rothstein in connection with the purchase of the settlements.    He knew Preve was not effectively implementing the procedural safeguards they has represented to investors.  For example, Preve told Levin that he was not receiving documentation for purchased settlements so Levin could address it with Rothstein.

*Id*. at ¶ 32.  These allegations are enough to establish that Levin knew that the representations in the PowerPoints were false during the relevant period.

Nor, as Levin contends, does Preve's email necessarily demonstrate Levin's lack of knowledge.  Levin argues that Preve's statement to Rothstein that he needed the documents because he could not "show anyone that [he is] a complete idiot," D.E. 86 at ¶ 31, demonstrates conclusively that Levin had no knowledge that Preve had "sen[t] out millions of dollars with nothing to show for it . . . ."  *Id*.  While the Court recognizes that Preve's reference to "anybody" could have meant

"anybody" in the strict sense of the word, thereby excluding the possibility of Levin's knowledge, the context of the email suggests that Preve was referring to the auditors when he stated that he could not show "anyone that [he was] a complete idiot by sending out millions of dollars with nothing to show for it . . . ." *Id.*  In this regard, the statement appears in the sentence, "[Y]ou are also holding up our audit because I can't show anyone that I am a complete idiot by sending out millions of dollars with nothing to show for it . . . ." *Id.*  On a motion to dismiss, the Court must draw all plausible inferences in favor of the plaintiff.  In view of the other allegations in the Amended Complaint asserting that Levin was Banyon's managing member and was personally involved in the purchase of settlements from Rothstein and that Preve advised Levin of the missing documentation for the express purpose that Levin would address the issue with Rothstein, the reference to "anybody" in Preve's July 11, 2008, email does not overcome the reasonable inference that Levin in fact knew that he was purchasing settlements without the supporting documentation, despite making representations to the contrary.

### 2. Defendants' Role in the BIF Fraud

In addition to pleading with sufficient particularity Defendants' involvement in the Banyon fraud, the Amended Complaint adequately alleges Defendants' misconduct with respect to BIF. Although Defendants assert that the Amended Complaint is devoid of any specific allegations related to the BIF offering materials or investors, the Court concludes otherwise.

According to the Amended Complaint, Defendants established BIF in order to raise more money for the purported Rothstein settlements.  By that point, however, as Defendants knew, Rothstein had ceased payments on a majority of the settlements that Defendants had purchased, and the only way for Defendants to maintain the possibility that Defendants' investments in Banyon

would be repaid was to raise $100 million.  Despite these circumstances, BIF's offering materials guaranteed investors a low-risk investment and touted the success of the Banyon settlements.  Like the Banyon PowerPoint presentations, the BIF PPM represented that the settlements were backed by supporting documentation and that the settlements would undergo verification procedures to ensure the security of the investment.  And also like the representations in the Banyon PowerPoint presentations, these representations were allegedly false.  Thus, the SEC argues, Defendants are liable for both material misrepresentations and for omissions of material fact, including the PPM's alleged false representations that the settlements were secured by authenticating documentation and verification procedures and the PPM's failure to disclose that Rothstein had previously ceased payments on a majority of the settlements that the Levin entities had purchased and that Rothstein had advised Defendants that he would not continue payments unless and until Defendants raised another $100 million to fund "settlements."

Again, Defendants insist that these allegations are not specific enough.  But the SEC is not required to plead every instance where the offering materials were shown to investors, nor is it required to identify who each investor was.  Although allegations of date, place, or time would fulfill Rule 9(b)'s provisions, "nothing in the rule requires them."  *Seville Indus. Mach. Corp.*, 742 F.2d at 791.  Rather, "[p]laintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  *Id.*  Here, the SEC has satisfied its burden.

The facts explicitly state that Rothstein had ceased payments and that Defendants established BIF in order to raise funds so that Rothstein could resume the settlement payments.  According to the Amended Complaint, BIF's very purpose was to raise the $100 million that Rothstein had demanded essentially as a ransom for Rothstein's continued payment on Defendants' earlier

investments with Rothstein.  In addition to failing to disclose this information to investors, the Amended Complaint also alleges that Defendants knowingly made misrepresentations to investors regarding the existence of settlement documentation.  The Amended Complain describes one email in particular, in which Preve asks Rothstein for the missing documentation and expresses concern over the potential public scrutiny over their financial data, noting the "cavernous hole that [he] allowed to be created."  D.E. 86 at ¶ 47.  In addition, knowledge of these omissions and misrepresentations is adequately attributed to Levin as a result of his involvement in and control over the BIF operations.

In short, the Court disagrees with Defendants' position that the SEC has not pled the fraud allegations with sufficient particularity.  The Amended Complaint provides Defendants with an adequate description of the misconduct with which they are charged so that Defendants may defend themselves.  Rule 9(b) requires nothing more.

### B.  Materiality and Scienter under
### Section 17(a),  Section 10(b), and Rule 10b-5

Defendants further argue that the Amended Complaint should be dismissed for failure to state a claim for securities fraud under Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act, and SEC Rule 10b-5 (corresponding to Counts II-VI of the Amended Complaint).  Specifically, Defendants contend that the Amended Complaint does not sufficiently allege materiality and scienter, which are essential elements of the claims.

To establish a violation of § 17(a)(1) (Count II of the Amended Complaint), the SEC must prove (1) a material misrepresentation or materially misleading omission (2) in the offer or sale of a security, (3) made with scienter. *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir.

2012).   To establish a violation of section § 17(a)(2) or 17(a)(3) (Count III of the Amended Complaint), the SEC must demonstrate (1) a material misrepresentation or materially misleading omission (2) in the offer or sale of a security, (3) made with negligence.   *Id.*   And finally, to establish a violation of § 10(b) or Rule 10b-5 (Counts IV-VI of the Amended Complaint), the SEC must show (1) a material misrepresentation or materially misleading omission (2) in connection with the purchase or sale of a security, (3) made with scienter.   *Id.*   Thus, materiality is an essential element of Counts II-VI, while scienter need be alleged only with respect to Counts II, IV, V, and VI.

## 1.  Materiality

As part of its pleading, the SEC must allege that Defendants made material misstatements or omissions.  The SEC claims that Defendants distributed offering materials to Banyon and BIF investors advertising the investments' purported low-risk, high-yield strategy.  According to the allegations in the Amended Complaint, however, the very thing that made the investments low risk—the documentation underlying Rothstein's legal settlements—was in fact non-existent.  As a result, under the allegations of the Amended Complaint, the statements contained in the Banyon PowerPoint presentations and the BIF PPMs were decidedly untrue, thus making them misrepresentations.  Furthermore, the SEC avers that Defendants failed to disclose pertinent information to BIF investors regarding the increasing uncertainty of the settlement payments, the fact that Rothstein had ceased making payments on numerous Banyon settlements, and the fact that Defendants needed to raise $100 million for payments on their investments to date to be resumed. The lack of any reference to these circumstances in the offering materials renders them omissions.

Thus, the Court must consider whether the Amended Complaint sufficiently establishes that these misrepresentations and omissions, if true, were material.  In the context of securities fraud, the

test for materiality is "whether a reasonable [person] would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (quoting *SEC v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir.1982)) (internal quotation marks omitted); *see also SEC v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004) ("Materiality is proved by showing a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (internal citation omitted)). As the Eleventh Circuit has explained, the issue of materiality is usually decided by the trier of fact and may only rarely be resolved at the motion-to-dismiss stage, unless the alleged misrepresentations or omissions are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *SEC v. Bankatlantic Corp., Inc.*, 2012 WL 1936112 at *10 (S.D. Fla. May 29, 2012) (citing *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002)). Here, that is plainly not the case.

Defendants claim that any alleged misrepresentations in the Banyon PowerPoints and BIF PPMs were immaterial because the underlying legal settlements were non-existent, anyway, so investor losses would have been the same, regardless. Thus, Defendants reason, the SEC is simply faulting them for not having obtained "sham" documents from Rothstein.

But the Court must ignore the SEC's actual allegations to conclude, as Defendants suggest, that their alleged misrepresentations were not material. At issue is not merely Defendants' failure to obtain documentation from Rothstein, but rather, Defendants' claims to investors that Banyon insisted on obtaining such documentation supporting the investment prior to the payment of any monies, when Defendants knew that this was not actually the case. Thus, the Amended Complaint asserts that Defendants marketed a "low risk" investment opportunity to investors even though they

-22-

knew that they did not have the documentation that would have made the investment secure, and they knew that Rothstein was dragging his feet on providing the requested documentation, despite repeated requests for it.  Such conduct by Rothstein certainly could have been viewed by potential investors as a red flag and as a telltale sign of what ultimately turned out to be the case — the fact that no actual underlying settlements existed in the first place.  The Court cannot characterize these alleged misrepresentations as "so obviously unimportant" to a reasonable investor that it would warrant resolution of the issue at this stage.

Nor does the Court agree that Defendants' alleged failure to disclose to BIF investors that Rothstein had ceased making payments on a number of settlements and that Defendants had to raise another $100 million before Defendants' earlier investments could be repaid were immaterial.  Defendants argue that these omissions are irrelevant because Defendants did, in fact, raise the $100 million, and regardless, investor losses would have been the same because the money paid to Rothstein was only a temporary reprieve from the failing scheme.  Materiality, however, is not measured by the consistency of investor losses after the fact, but rather, by whether a reasonable investor might have made a different investment decision on the basis of the undisclosed information prior to investing.  The Court cannot find that no reasonable investor would have changed his or her decision to invest, had that investor known that Rothstein had ceased payments on the majority of Banyon's prior investments and that Rothstein had threatened never to resume the payments if Defendants did not provide him with another $100 million.  As with the material misrepresentations, knowledge of the alleged true state of affairs could have given a reasonable investor serious pause before deciding to turn over his or her money to, directly, an entity run by individuals whose prior investments depended on Defendants' raising of another $100 million, and to, down the line, a man

who had already failed to make good on substantial investments.  Thus, the SEC has sufficiently alleged the element of materiality.

## 2. Scienter

Defendants further assert that the Amended Complaint fails to sufficiently plead the element of scienter because the Amended Complaint does not plead scienter with particularity.  The Court disagrees that the law requires the SEC to satisfy this standard of pleading as it pertains to scienter.

The Supreme Court has defined scienter as a "mental state embracing intent to deceive, manipulate, or defraud." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11th Cir. 1999) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)).  Although Rule 9(b) requires that fraud or mistake be alleged with particularity, it explicitly provides that "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P 9(b).  While the Private Securities Litigation Reform Act does require a heightened pleading standard for scienter, by its language, it applies only to private actions, not to SEC enforcement actions.  *See SEC v. Betta*, 2010 WL 963212 at *n.5 (S.D. Fla. March 15, 2010) (citing 15 U.S.C. § 78u–4(a)(1) (2006) ("The provisions of this subsection shall apply in each private action arising under this chapter")).  Thus, unlike private securities litigants, "the SEC need only allege scienter generally." *Id.* (quoting *SEC v. Berry*, 580 F. Supp. 2d 911, 920-21 (N.D. Cal. 2008)) (internal quotation marks omitted); *cf. also United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012) (noting that although a private action under the False Claims Act must meet the heightened pleading standard of Rule 9(b) when alleging the mechanics of the fraud, the complaint may generally plead the scienter portion of the fraud allegations).

The Amended Complaint grounds Defendants' liability on their alleged conscious deception

of investors regarding the supposed low-risk investment in the Rothstein settlements. It unambiguously claims that Defendants knowingly purchased settlements without supporting documentation while giving presentations to investors touting the contrary. Because the SEC need only plead Defendants' state of mind generally, the factual allegations are enough to establish the element of scienter.

## C. Ultimate Authority Under Section 10(b) and Rule 10b-5

According to the SEC, Levin is liable under Section 10(b) and Rule 10b-5 as a primary violator because he had "ultimate authority" over the statements at issue. Invoking *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2302 (2011), Defendants assert that Levin's ultimate authority cannot support liability because Levin did not draft the allegedly offending statements.

As Levin correctly notes, in *Janus*, the Supreme Court stated that "one 'makes' a statement by stating it" and that "one who prepares or publishes a statement on behalf of another is not its maker." But even if *Janus* applies in the context of an SEC enforcement action,[5] it does not carry

---

[5]In *Janus*, the Supreme Court was specifically concerned about expanding Rule 10b-5's implied private right of action. *Id.* Because the case was brought by private litigants, the Court was hesitant to expand liability in an action not explicitly authorized by Congress. *See id.* at 2303. That concern is not present in an SEC enforcement action, where congressional authority is definitive. *See* 15. U.S.C. § 78u; *see also SEC v. Bilzerian*, 750 F. Supp. 14, 15 (D.D.C. 1990) ("Congress vested the SEC . . . with civil enforcement authority for alleged violations of the federal securities laws."). In addition, the plaintiffs in *Janus* were attempting to attribute statements made by one legal entity to another, independent entity. *Janus*, 131 S. Ct. at 2302. *Janus* involved various false statements in mutual fund prospectuses filed by Janus Investment Fund. *Id.* at 2299. The Court refused to attribute those statements to the Fund's investment advisor, Janus Capital Management, because the two entities maintained legal independence. *Id.* at 2304. The Court rejected the suggestion that an investment advisor should be understood to be the "maker" of statements by its client mutual fund and declined "the invitation to disregard the corporate form." *Id.* The situation in *Janus* is not comparable to the one in the pending matter because the alleged "makers" of the statements are individual agents of the entities in question. *See e.g., City of St. Clair Shores Gen. Employees'*

the meaning that Levin attempts to saddle it with.  Rather, the Supreme Court expressly explained that "for purposes of 10b-5, the maker of the statement is the person or entity *with ultimate authority* over the statement, including its content and whether and how to communicate it." *Id.* (emphasis added).  In so doing, the Supreme Court analogized a person who contributes to the content of a securities statement but does not control what information is ultimately included in the statement and a speechwriter, on the one hand, and similarly analogized a person or entity with ultimately authority over the statement and the person who delivers the speech, on the other, distinguishing the roles of contributor and content authorizer.  *Id.*  As the Court explained, "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit — or blame — for what is ultimately said." *Id.* Thus, a person makes a statement for purposes of Rule 10b-5 when that person *has control* over the content, regardless of whether the person actually drafts the content.  *See id.* ("Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.").

The Amended Complaint alleges that Levin, as the managing member and owner of Banyon, had ultimate control over the content of the statements issued by Banyon and BIF, including the PowerPoint presentations and other offering materials distributed to potential investors.  These allegations suffice to qualify Levin as a "maker" of the statements in question.  *See also SEC v. Daifotis*, 874 F. Supp. 2d 870, 881 (N.D. Cal. 2012) ("The Court is persuaded that in the wake of

---

*Retirement System v. Lender Processing Servs., Inc.*, No. 3:10–cv–1073–J–32JBT 2012 WL 1080953 (M.D. Fla. Mar. 30, 2012) (noting that the individual defendants "made such statements as agents of [the company], which is distinguishable from *Janus*, where the statements were on behalf of a separate, independent entity").  Such legal entities can act only through their officers and agents. *See e.g.*, *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) ("[U]nder basic agency principles, the acts of a corporation's agents are considered to be those of a single legal actor.").

*Janus*, an executive who undisputably exercised authority over his own non-casual statements with the intent and reasonable expectation that such statement would be relayed to the investing public, should be deemed to be the person who "made" the statements to the investing public."). Thus, the allegations state a claim for primary liability under Section 10(b) and Rule10b-5 based on Levin's alleged ultimate authority over the content of the Banyon PowerPoints and BIF offering materials.

### D. Substantial Assistance Under Section 10(b) and Rule 10b-5

In Counts V and VI of the Amended Complaint, the SEC alleges that Defendants are also liable for aiding and abetting violations under Section 10(b) and Rule 10b-5. Specifically, the Amended Complaint contends that Preve is liable for aiding and abetting Levin's violations and that both Levin and Preve are liable for aiding and abetting Banyon and BIF's violations.

The Eleventh Circuit has determined that "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party has general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985) (citation and internal quotation marks omitted). Thus, a plaintiff must demonstrate three elements to establish aider-abettor liability: (1) a primary securities violation, (2) requisite scienter, and (3) knowing and substantial assistance to the primary violation. *Id.* Whether the assistance was "substantial" depends on the totality of the circumstances. *Id.* at 1010.

Levin first argues that no secondary fraud liability can exist because the SEC has not alleged a primary violation. Because the SEC has adequately alleged a primary violation, for the reasons stated in Part III.C above, however, this argument cannot succeed.

Defendants next assert that the aiding-and-abetting claims should be dismissed because the Amended Complaint fails to establish that Defendants knowingly and substantially assisted in the alleged fraud.  To satisfy the prong of knowing and substantial assistance, the SEC must show that Defendants were a "causal factor in the perpetration of the fraud." *Woodward*, 765 F.2d at 1013.

Preve claims that he did not have the requisite knowledge of impropriety or fraud, and Levin argues that the SEC fails to allege that he even participated in the drafting of the statements or that Preve was involved in the day-to-day operations of either entity.  The Court does not agree with these assertions.  As discussed previously, the SEC has sufficiently alleged Preve's knowledge of and involvement in the alleged fraud.  Similarly, contrary to Levin's contention, the Amended Complaint expressly avers that "Levin and Preve marketed the [promissory] notes to investors," that "Levin and Preve showed and distributed [PowerPoint presentations] to investors," that Levin was the managing member of Banyon, and that Preve "handled the day-to-day operation" of the settlement purchases on behalf of Banyon.  D.E. 86 at ¶¶ 25, 29-30.  The fact that the SEC does not allege that Levin actually drafted the presentations matters not, as his liability is predicated on his ultimate authority over the presentations' content.

Other allegations in the Amended Complaint likewise support Defendants' substantial assistance in the alleged fraud.  According to the Amended Complaint, Levin and Preve, through Banyon, distributed offering materials containing false statements to investors.  The promissory notes offered to investors through these materials were drafted by Preve and executed by Levin.  Subsequently, Levin and Preve purportedly established BIF in order to raise more money for the Rothstein settlements.  Contrary to representations in the BIF private placement memorandum, BIF purchased settlements without first obtaining the proper documentation, and Defendants failed to

-28-

disclose to investors that Rothstein had ceased making payments on prior settlements or that Rothstein had conditioned further payments on Defendants' prior investments with him on their raising of $100 million in new funding.  The facts in the Amended Complaint, accepted as true, thus show that Levin and Preve were instrumental to the Banyon and BIF investment schemes.  This, coupled with Defendants' purported knowledge of the falsity of the pertinent representations, is enough to establish the "knowing and substantial assistance" element of the aiding-and-abetting claims.

### D. Exemption Under Sections 5(a) and (c) of the Securities Act

Preve maintains that Count I of the Amended Complaint should be dismissed because the SEC has failed to state a claim for the sale of unregistered securities under §§ 5(a) and 5(c) of the Securities Act.  Absent an exemption, § 5 of the Securities Act prohibits any person from selling or offering to sell a security in interstate commerce unless a registration statement has been filed with the SEC.  *See* 15 U.S.C. §§ 77e(a), 77e( c); *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1263, 1367 (S.D. Fla. 1999).  To establish a violation of this section, the SEC must show that (1) securities were offered or sold for which no registration statement was filed or in effect; (2) the offering or sale was made through the means or instruments of transportation or communication in interstate commerce or the mails; and (3) defendants, directly or indirectly, offered or sold the securities.  *Friendly Power Co.*, 49 F. Supp. 2d at 1367 (citing *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972)).  Neither negligence nor scienter is an element of the prima facie case.  *Id.*

The SEC alleges that Levin, through Banyon, began offering investors promissory notes for the purpose of purchasing discounted legal settlements from Rothstein.  D.E. 86 at ¶ 22.  These promissory notes were purportedly drafted by Preve and executed by Levin.  *Id.* at ¶ 23.  Further, the

-29-

SEC asserts that no registration statement was filed or in effect, and no exemption from registration existed. *Id.* at ¶ 34. These facts, the SEC maintains, are sufficient to state a claim under § 5 of the Securities Act.

Preve contends, however, that this Count should be dismissed because the promissory notes at issue were exempt from registration. But the existence of a registration exemption is an affirmative defense that must be pled by a defendant, not negated by the SEC as a plaintiff. *SEC v. ConnectAJet.com, Inc.*, No. 3:09-CV-1742-B, 2010 WL 2484280, at *3-*5 (N.D. Tex. June 17, 2010). While, generally, the existence of an affirmative defense will not support a motion to dismiss under Rule 12(b)(6), a complaint may be dismissed when the affirmative defense clearly appears on the face of the complaint and its allegations. *Fortner v. Thomas*, 893 F.2d 1024, 1028 (11th Cir. 1993).

Preve maintains that the exemption from registration is apparent on the face of the Amended Complaint because the SEC alleges that the term of the notes was "generally 180 days" and an exemption applies to six-month promissory notes. Defendants previously raised this same argument in their original motions to dismiss, and this Court rejected it at that time. *See* D.E. 83 at 17. Nothing has changed since that time, and Defendants have not demonstrated any error with regard to the Court's previous analysis of this issue. As a result, Defendants can fare no better in raising their exemption argument on the pending Motions to Dismiss than they did in raising it in the original motions to dismiss.

## IV. CONCLUSION

For the above reasons, it is **ORDERED AND ADJUDGED** that Defendants Motions to

Dismiss are **DENIED.**

     **DONE AND ORDERED** at Fort Lauderdale, Florida, this 10th day of October 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE