**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 1:12-cv-21917-UU

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.

GEORGE G. LEVIN, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER

THIS CAUSE is before the Court upon Plaintiff's Motion for Summary Judgment (D.E. 176) and Defendant Frank Preve's Motion for Summary Judgment (D.E. 177). Defendant George Levin filed a Notice of Joinder joining Preve's Motion. D.E. 173. Defendant Levin filed a Response to Plaintiff's Motion on August 25, 2014, D.E. 190, and Plaintiff filed a Response to Preve's Motion on the same date, D.E. 191. Defendant Preve filed a Notice of Joinder stating he joins in Levin's Response to Plaintiff's Motion. D.E. 189. Replies were filed on September 4, 2014. D.E. 207, 208. Accordingly, the Motions are now ripe for disposition. Also before the Court is Defendant Levin's Motion for Order to Show Cause, filed on August 26, 2014. D.E. 194. For the following reasons, Plaintiff's Motion, D.E. 176, is DENIED IN PART and GRANTED IN PART; Defendant Preve's Motion, D.E. 177, is DENIED; and Defendant Levin's Motion, D.E. 194, is DENIED.

THE COURT has considered the Motions, the pertinent portions of the record, and is otherwise fully advised on the premises.

1

## I.  PROCEDURAL POSTURE

Plaintiff Securities and Exchange Commission ("SEC") filed an Amended Complaint on March 8, 2013, against Defendants George Levin and Frank Preve.  D.E. 86.  The Complaint alleges six counts:  (1) Count I alleges an unlawful sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act; (2) Count II alleges fraud in violation of Section 17(a)(1) of the Securities Act; (3) Count III alleges fraud in violation of Sections 17(a)(2) and 17(a)(3) of the the Securities Act; (4) Count IV is against Levin only and alleges fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5; (5) Count V is against Preve only and alleges an aiding and abetting violation of Section 10(b) of the Exchange Act and Rule 10b-5; and (6) Count VI is in the alternative and alleges an aiding and abetting violation of Section 10(b) of the Exchange Act and Rule 10b-5 against both Preve and Levin.  In the Amended Complaint, the SEC requests declaratory relief, permanent injunctive relief, disgorgement, and civil penalties.  The allegations forming the basis of the SEC's Complaint arise out of the activities of two entities that invested money in the Rothstein Ponzi scheme, Banyon 1030-32 LLC and Banyon Income Fund, L.P.  The SEC moves for summary judgment on all counts, requests the Court enter a permanent injunction, and requests that the Court order disgorgement and prejudgment interest.  Defendant Preve moved for summary judgment on all counts, but on September 29, 2014, the SEC moved for entry of a consent judgment against Preve.  Accordingly, the SEC's motion for summary judgment against Preve is rendered moot, and the Court will not address the arguments raised against Preve.  The Court will, however, address the arguments raised in Preve's Motion, although it would otherwise be rendered moot, to the extent they are applicable to Levin because Levin filed a notice of joinder in Preve's motion.

## II. FACTS

The following facts are undisputed unless noted otherwise.

### A.     *Rothstein Ponzi Scheme*

From 2005 to 2009, Scott Rothstein used his law firm, Rothstein, Rosenfeldt and Adler P.A. ("RRA") to operate a Ponzi scheme by offering investors the opportunity to purchase legal settlements at a discount.  D.E. 176-1 ¶¶ 4-6; D.E. 172-8 at 9-10.  Rothstein and others at RRA would falsely claim that clients of RRA were plaintiffs who had reached confidential settlement agreements with large corporations in sexual harassment and whistle-blower actions, and that the full amount of these settlements had been deposited in RRA's trust accounts.  D.E. 176-1 ¶¶ 7, 8; D.E. 172-8 at 10.  Rothstein falsely represented that the settlement agreements required the plaintiffs to receive periodic payments from RRA's trust accounts to ensure they complied with the agreements' confidentiality provisions, but that the plaintiffs were willing to assign their settlement payments from the trust accounts in exchange for discounted, immediate cash payments from investors.  D.E. 176-1 ¶¶ 8, 9; D.E. 172-8 at 10.

The settlements, however, never actually existed, and Rothstein used investors' money to make payments to other investors and support his lifestyle.  D.E. 176-1 ¶¶ 10, 11.  The Ponzi scheme collapsed in October 2009, and Rothstein pleaded guilty on January 27, 2010 to a five count information charging one count each of racketeering conspiracy, conspiracy to commit money laundering, conspiracy to commit mail and wire fraud, and two counts of wire fraud.  *Id.* ¶ 12; D.E. 172-8.

### B.     *Banyon 1030-32*

3

Levin met Rothstein in 2007 and began personally investing in Rothstein's scheme around that time.  D.E. 176-1 ¶ 13.  Levin increased the number and dollar amount of his investments, and began using his dormant legal entity, Banyon 1030-32 ("Banyon"), to purchase the purported settlement agreements in July 2007.  *Id.* ¶ 14; D.E. 190-1 ¶ 206.  From July 2007 to December 2007, Levin used his own funds to purchase settlements.  D.E. 190-1 ¶ 212.

### i.    Settlement purchase procedure

Levin met Preve in the 1970s, and Preve has intermittently worked for Levin in various capacities since 1984.  *Id.* ¶¶ 198, 199.  Preve handled the paperwork for purchasing the settlement agreements.  D.E. 176-1 ¶ 18.  Rothstein would email Banyon detailing settlements that Banyon could purchase, including the face value of the settlement and the payment schedule, and Banyon would decide whether or not to invest in the settlement.  *Id.* ¶ 19.  Levin determined the parameters of the settlements Banyon would purchase, and he would decide whether Banyon would invest in settlements that did not meet his parameters.  *Id.* ¶ 20.  To purchase a settlement agreement, Banyon would wire money from its operating account into Rothstein's trust account.  *Id.* ¶ 22.

Between July and October 2007, Rothstein and Preve developed a document package for each settlement agreement purchased by Banyon, which Levin approved.  *Id.* ¶ 23; D.E. 190-1 ¶ 208.  The following documents were included in each package: (1) a copy of the executed settlement and confidentiality agreements between the plaintiff and defendant, with the names and contact information of the parties redacted; (2) a copy of the bank wire confirmation or bank balance summary evidencing that the defendant had fully funded the settlement in an RRA trust

4

account; and (3) a document assigning the plaintiff's rights to the settlement payments to Banyon 1030-32 in exchange for an immediate payment.  D.E. 176-1 ¶ 24.

### ii.    Promissory notes given to outside investors

Starting in late December 2007, Banyon began obtaining outside investors to fund purchases of settlement agreements offered by Rothstein.  *Id.* ¶¶ 25, 26.  These investors received promissory notes from Banyon that were personally guaranteed by Levin, and had a fixed interest rate between 12% and 30% per year, with most ranging from 18% to 20%.  *Id.* ¶¶ 25, 26, 28-30.  Preve testified that Levin negotiated the interest rates for the promissory notes, D.E. 172-12 at 114:6-16; Levin, however, maintains that he did not negotiate interest rates.  D.E. 210-1 ¶ 42.  Banyon's profit was based on the difference between the settlement agreements' discounted value and the interest payable pursuant to the promissory notes.  D.E. 176-1 ¶ 31.

The initial term of the notes was six months.  D.E. 176-1 ¶ 50; D.E. 190-1 ¶ 213.  Whether the notes automatically renewed at the end of six months is disputed.  The SEC states that the notes "automatically renewed unless the investor gave 30-day notice of cancellation at the end of the initial six-month period."  D.E. 176-1 ¶ 50.  Levin disputes this, D.E.190-1 ¶ 50; he did, however, testify at his deposition that beyond the notes' six-month terms, investors could "get out with a 30-day notice" and that although he was unsure, he thought that the notes would "just keep rolling over . . . or renew[]" if the investors did not provide a 30-day notice.  D.E. 172-27 at 303:14-304:20.  Levin does not dispute that more than 90 percent of investors maintained their investments under the promissory notes beyond the initial six-month term, and the investors' money continued to roll over, mostly into the purchase of new settlements.  D.E. 176-1

¶ 51.  No registration statement was filed or in effect with the SEC pursuant to the Securities Act

with respect to the Banyon promissory notes.  *Id.* ¶ 58.

Between late December 2007 and early January 2008, Levin and Preve persuaded their

friends, family, and acquaintances to invest in the settlements purchased by Banyon.  *Id.* ¶ 25.

Then, in early 2008, Levin and Preve began seeking funding from others.  *Id.* ¶ 26.  All of these

investors received promissory notes, as described above, in exchange for their investments.

*Id.* ¶¶ 25, 26.

The parties dispute how Banyon solicited potential investors and what roles Preve and

Levin had in the solicitation process.  *See id.* ¶¶ 32, 33; D.E. 190-1 ¶ 215.  According to the SEC,

both Levin and Preve "marketed the Banyon investment to investors, met with potential investors

to tell them about the investment, and participated in showing potential investors the PowerPoint

presentations."  D.E. 176-1 ¶ 32.  Levin, however, states that Preve created the PowerPoint

presentation, that it was only shown to 14 of 83 total note holders, and that Levin attended only

two meetings with prospective note holders where the PowerPoint was shown.  D.E. 190-1 ¶ 215.

According to Levin, his "role in meetings with prospective note holders was to introduce himself

to show that he was real; he did not engage in substantive discussions regarding Banyon."  *Id.*

Regarding meetings with potential investors, Levin testified that he may have met with

one or two potential investors, but that he could not remember any details.  D.E. 172-27 at

280:23-7.  He remembered meeting with a potential investor who owned a large gas company to

see if the gas company owner wanted to invest his money in Banyon.  *Id.* at 281:8-282:282:12.

Preve, however, testified that he and Levin met with a number of potential investors, including at

least six individuals that were referred to Banyon through Levin's wife's cousin, Joseph DiSilva,

and that at these meetings Levin gave background information about Banyon and RRA and described the settlement purchase strategy.  D.E. 172-14 at 433:4-434:5.

Regarding the PowerPoint presentations, Preve testified that he was the "gatekeeper" for changes, but that Levin and others gave input as to what should be included.  D.E. 172-12 at 102:7-103:2.  Levin testified that Preve made the PowerPoints and that Preve updated the presentations.  D.E. 172-21 at 77:8-18, 134:13-20.  Levin also testified that he could not remember taking steps to verify the accuracy of the statements included in the PowerPoint presentations.  D.E. 172-27 at 313:24-315:23.   Levin and Preve stipulated that as the managing member of Banyon, Levin had ultimate authority over the content of the PowerPoint presentations.  D.E. 199 at 7, ¶ 23.

Preve testified that a typical meeting with a potential investor would go as follows:  Levin would open the "meeting by giving some background on himself," then Levin would provide background on how Banyon began investing in settlement agreements and on Rothstein's law firm.  D.E. 172-14 at 433:7-25.  Levin would then hand the meeting over to Preve who would walk through the PowerPoint.  *Id.*  Levin would remain in the meeting to banter with potential investors.  *Id.*  Preve would most likely go through Banyon's financial information because "[e]verybody was interested in the metrics."  *Id.*

The parties agree that certain representations were made in the PowerPoint presentations. The presentations described Banyon's "low risk investment strategy" and its "risk mitigation factors."  D.E. 199 at 7, ¶ 20.  The PowerPoint described the "document flow" of the settlement purchase and indicated the order in which documents would be executed and received.  *Id.* The PowerPoint stated that "100% of the settlement funds cover [sic] by the Settlement Agreement

7

are wired to and received by the [RRA trust account] before any disbursements are made by [Banyon 1030-32 to purchase the settlements]." *Id.* Additionally, the PowerPoint stated Banyon 1030-32 "will have all executed documents necessary to access [the settlement funds] BEFORE any disbursements are made." *Id.*

The parties agree that both Levin and Preve met with Curt Lyman, an investment advisor and wealth manager, in late 2007 or early 2008, to solicit one of Lyman's clients to invest in Banyon. D.E. 176-1 ¶ 34. Levin and Preve explained the investment strategy, how Banyon operated, and the controls Banyon had put in place. *Id.* They all met a second time to discuss the risk associated with the investments and, in January 2009, Lyman invested his own money in Banyon *Id.*

The parties also agree that Preve and Levin took a number of different steps to solicit investors. Preve solicited investors via email by sending them the PowerPoint presentation and Banyon financial information. *Id.* ¶ 35. Levin gave commissions to a few investors in Banyon, such as his daughter, when they brought in new investors. *Id.* ¶ 36. Other individuals, including Lyman and DiSilva, began bringing in outside investors in June 2008 and February 2008, respectively, and did so until Banyon ended. *Id.* ¶ 38.

To obtain more funding, Banyon established lines of credit with New York-based hedge funds to finance settlement purchases. *Id.* ¶ 41; D.E. 190-1 ¶ 233. These hedge funds set up separate trust accounts with Rothstein, and independently decided whether they would fund certain settlement purchases. D.E. 172-21 at 94:6-14, 147:8-24

### iii.    Total investments received by Banyon

The parties dispute how many investors were issued promissory notes by Banyon, and they dispute the total dollar amount invested with Banyon.  Plaintiff contends, based on the declaration from an accountant at the SEC, Tonya Tullis, who reviewed the Quickbooks' General Ledger for Banyon, that Banyon received over $57 million from ninety investors between December 2007 and October 2009.  D.E. 172-38 ¶ 5.  Defendants contend, based on a spreadsheet prepared by Preve from his review of the "Banyon 1030-32 books and records," that Banyon received $50 million from 83 investors.  D.E. 175 ¶ 10; D.E. 174-5.  For purposes of the SEC's motion for summary judgment on Defendants' exemption defenses, Defendants also contend that only 19 note holders were non-accredited.  D.E. 175 ¶ 10.

### C.    Mid-2009 Rothstein Bar Issues

In April 2009, Rothstein informed Levin and Preve that he was having issues with the Florida Bar and could potentially lose his bar license.. D.E. 176-1 ¶¶ 60, 61.  Rothstein stated that his clients, the purported plaintiffs who had reached confidential settlements, were complaining to the Florida Bar because Rothstein was not making promised settlement payments. *Id.* ¶ 60. According to Rothstein, he needed more than $98 million to fund the settlements.  *Id.* ¶ 67.

The parties dispute whether Rothstein ceased making scheduled payments to Banyon at that time.  From reviewing Levin's and Preve's testimony, it is clear that Rothstein had at least partially stopped payments to Banyon, and that the funds in Banyon's trust account with Rothstein were frozen.  The parties stipulated that as of mid-April 2009, "Rothstein had ceased payments on some of the settlements the associated Levin entities had purchased."  D.E. 199 ¶ 33.

9

Defendants contend that Rothstein only ceased making payments to the hedge funds through their trust accounts, but continued to make payments to Banyon.  D.E. 190-1 ¶ 252. Preve testified that Rothstein stopped the payment stream only as to the hedge funds, but continued to fund Banyon during April 2009.  D.E. 172-13 at 276:4-7.  Preve, however, also testified that Rothstein stopped all payments to Banyon or any of the Banyon collection accounts in early April 2009.  *Id.* at 259:9-23.  Levin testified that the payments from Rothstein stopped for both the New York hedge funds and Banyon.  D.E. 172-21 at 280:2-12, 289:6-290:20.  Levin also testified, however, that there were partial payments being made to Banyon at this time, but that the funds Rothstein owed Banyon were not being fully released.  *Id.* at 291:2-24.  Levin repeatedly testified that the trust accounts were frozen, even if Banyon was receiving periodic payments from Rothstein.  D.E. 172-21 at 284:4-24, 296:17-21, 297:12-19, 301:9-22, 392:16-393:6.

The parties do not dispute that as of June 2009, Rothstein had not released $214 million that was owed to the Banyon entities.  D.E. 176-1 ¶ 176.

### D.    *Creation of Banyon Income Fund in April 2009*

#### i.    **Barry Bekkedam and Banyon Income Fund**

Levin testified that he was attempting to find new funding sources for Banyon, and therefore met Barry Bekkedam, who managed investors' funds through his company, Ballamor, as a potential source of funding for Banyon.  D.E. 172-21 at 186:3-24, 301:23-303:10.  Levin brought in Bekkedam in March 2009 to meet Preve and discuss Banyon's current funding.  D.E. 190-1 ¶ 263; D.E. 172-13 at 322:9-323:3.  Levin testified that he expressed an urgency to

Bekkedam to bring in new money because Rothstein had received bar complaints for being unable to fund the settlement agreements.  D.E. 172-21 at 310:8-21.

Bekkedam subsequently decided to create the Banyon Income Fund[1] ("BIF").  D.E. 190-1 ¶ 263; D.E. 172-21 at 313:3-314:19.  Banyon 1030-32, LLC, was the general partner of BIF. D.E. 172-63.  BIF was structured so Bekkedam's clients, who had invested a large amount of money with Ballamor, would invest in BIF and receive a fixed rate of return.  D.E. 190-1 ¶ 263. BIF would then use the investors' funds to purchase settlement agreements from Rothstein.  D.E. 190-1 ¶ 263.  Like Banyon, RRA established a dedicated trust account for BIF at TD Bank.  *Id.* ¶ 286.

### ii.     Creating the PPM

Levin's goal was to raise $100 million through BIF, and he communicated that goal to Bekkedam.  D.E. 176-1 ¶ 75.  A private placement memorandum ("PPM") was created to seek capital contributions in exchange for limited partnership interests in BIF.  D.E. 172-76; D.E. 190-1 ¶ 285.  The investment objective of BIF was to "purchase, at a discount, settlements and related periodic revenue stream[s] . . . from individual plaintiffs who have settled their labor and employment related lawsuits or claims, and who would otherwise receive their settlement amounts over a period of time."  D.E. 172-26 at BANYON 00007.  The PPM states investors will receive a 15% return if they submit a contribution prior to December 31, 2010, and a 12% return if they submitted a contribution after that date.  D.E. 172-76 at BANYON 00009.  Levin,

---

[1]There is some confusion in the record over whether this fund was titled the Banyon Investment Fund or the Banyon Income Fund.  Levin testified that these entities were two separate things, and that Bekkedam created Banyon Investment Fund.  D.E. 172-21 at 187:8-21.  The documents submitted by Plaintiff, however, show that the company is titled Banyon Income Fund, D.E. 172-63, and Levin has stipulated that the entity was titled Banyon Income Fund, D.E. 199 ¶ 35.

as the managing member of the general partner of BIF, had ultimate authority over the operations and statements of BIF.  D.E. 176-1 ¶ 78.

The parties dispute the level of involvement Levin had in creating the PPM.  Levin testified that he "didn't care what the document would say or what it had in it, as long as everything we required was in everything else."  D.E. 172-21 at 322:7-10.  There are emails indicating, however, that Levin reviewed the PPM and revisions that others made to the PPM.  D.E. 208-7 at 13.

### iii.  Soliciting investments for BIF

The offering to investors included the PPM, the BIF partnership agreement, and a subscription agreement.  D.E. 176-1 ¶ 81.  The PPM described "essential steps" in the settlement purchase process, "indicating Banyon Income Fund would receive an assignment of the settlement and related revenue stream prior to Banyon Income Fund issuing a check to purchase a settlement."  D.E. 199 at 9, ¶ 37.  The PPM also stated that "Prior to purchase by [Banyon Income Fund], the full settlement amount to be paid on each Purchased Settlement will have been deposited in a trust account … and the right to receive distributions out of the trust account will be assigned to [Banyon Income Fund]."  *Id.*  The PPM also represented that each settlement would undergo a verification process where an independent third-party verifier would verify that a settlement agreement existed, and would verify that the settlement funds were in BIF's trust account.  *Id.* ¶ 38.

The parties dispute whether Levin and Preve solicited investors for BIF and whether they were aware of how investors were solicited for BIF.  *Id.* ¶ 74; D.E. 190-1 ¶ 264.

The SEC contends that Levin solicited investors for BIF through Ballamor, and that he

was aware of the investors that Bekkedam had solicited.  D.E. 176-1 ¶ 74.  To support this,

Plaintiff cites to testimony from Preve where he states that Levin was "trying to get Ballamor to

raise more money or to honor the commitments they had already made."  D.E. 172-11 at 115:18-

22.  Plaintiff also cites the following emails: one email sent from Bekkedam to Levin where

Bekkedam summarizes his clients who have decided to invest in BIF, D.E. 172-23; and an email

chain between Preve, Levin, and Bekkedam, where Bekkedam updates Levin and Preve

regarding his efforts to raise funds, and Levin encourages Bekkedam to continue his efforts,

stating, "Go get um tiger! We can use all the funds you can raise!" D.E. 172-37 at 3.

Defendants contend that Levin and Preve thought that Bekkedam would "not need to

solicit investors for the Banyon Fund because he had the authority to place Ballamor's clients'

funds into investments with the Banyon Fund."  D.E. 190-1 ¶ 264.  To support this, Defendants

cite to Preve's testimony that he understood Bekkedam to have "all these clients" and that he

"had discretionary authority to allocate a certain percentage of their assets to various types of

investments, and he was just going to add the Banyon notes or partnership investments as part of

that investment platform."  D.E. 172-13 at 330:4-11.  Defendants also cite Levin's testimony that

he understood Bekkedam was not going to solicit investors or find investors to contribute, and

that Bekkedam would invest his clients' money in BIF because he had the authority to do so.

D.E. 172-21 at 323:10-324:5.

The parties do not dispute that Ballamor served as the representative for all limited

partners who made capital contributions to BIF.  D.E. 190-1 ¶ 287.  Nor do they dispute that

neither Levin nor Preve attended meetings where Bekkedam solicited investors for BIF, nor were

they aware of specific communications between Bekkedam and prospective investors.  *Id.* ¶¶

290, 291.  The first investor invested in BIF on May 5, 2009.  D.E. 176-1 ¶ 89.  Between May

and October 2009, BIF received approximately $100 million from approximately 83 investors.

D.E. 176-1 ¶ 94.  All of the investors, except for one individual, came through Ballamor.  D.E.

190-1 ¶ 291.

> ### E.      Problems with Following Procedures

Preve testified that there were issues in the settlement verification process and the

document exchange procedures throughout the existence of the Banyon entities.   According to

Preve, there were many times when Banyon did not have in its possession all of the executed

documents prior to funding settlement purchases.  *See* D.E. 172-11 at 172:2-7.  Preve testified

that in 2007 and 2008, Banyon might be missing either a single document that would be included

in a typical settlement package, or the entire settlement package.  D.E. 172-14 at 406:6-19.

Toward the end of Rothstein's scheme, starting in July 2009, Preve ws not receiving the

underlying paperwork related to settlement agreements.  *Id.* at 406:20-24.  As the paperwork fell

behind, the independent third party verifier became unable to verify that the settlement

agreements existed and were fully funded.  *Id.* at 409:1-18.

Preve did not tell investors, Bekkdam, or Bekkedam's attorney, Larry Roven, that Banyon

was missing documentation regarding the settlement agreements.  *Id.* at 412:1-413:12, 435:3-7.

Yet,  Preve sent a number of emails to Rothstein expressing his aggravation and frustration

regarding the missing documentation packages and requesting the documents.  *See, e.g.*, D.E. 199

at 8, ¶ 25 ("Missing documents....these won't go away so someone needs to do them...........you

are also holding up our audit because I can't show anyone that I am a complete idiot by sending

out millions of dollars with nothing to show for it except some e-mails that say 'Hey, Guido,

send me 5 Mill..........I have such a deal for you.'").  Preve testified that Banyon initially felt

comfortable funding settlement agreements without having paperwork because "we had done it

all along with Banyon 1030.  Eventually, [Rothstein] always produced the documents, albeit

usually under pressure."  D.E. 172-13 at 373:11-17; *see also* D.E. 172-13 at 369:1-14 ("[W]e've

gone as long as three or four weeks on a Banyon 1030 without having the paperwork, but

[Rothstein] always came through with the paperwork.").  Levin became aware in June 2009 of

instances where Rothstein did not provide the documentation prior to Banyon's purchase of

settlements.  D.E. 176-1 ¶ 112.

   Preve also testified that BIF purchased $21 million in settlement agreements that were not

first fully funded by a defendant.  D.E. 172-5 at 548:5-15, 553:4-17.  Preve testified that he

informed Levin of this practice on several occasions so that Levin would discuss the problems

with Rothstein.  D.E. 172-14 at 403:23-25.   Levin admits that as of June 2009 he was aware of

BIF had made purchases prior to the settlements being fully funded on a few occasions D.E. 190-

1 ¶ 99.

   **F.   *Collapse of Banyon Entities and Criminal Prosecution of Frank Preve***

   As of September 3, 2009, Rothstein had still not paid Banyon all of the money it was

owed from the RRA accounts.  D.E. 176-1 ¶ 93.  At the end of October 2009, Rothstein's scheme

collapsed, and shortly thereafter he surrendered to federal authorities.  *Id.* ¶ 12.

   On July 14, 2014, the United States Attorney filed an information against Preve on

federal charges of conspiracy to commit wire fraud.  *Id.* ¶ 3.  The information is based on

allegations that Preve failed to disclose a number of facts from July 2009 through October 2009

to potential investors and lenders of the Banyon entities.  D.E. 172-4 ¶¶ 10-14.  On August 19,

2014, in the middle of the briefing schedule for these Motions, Preve pleaded guilty to the charges and stipulated to a statement of facts.  D.E. 208-2.

In Preve's stipulation, he stipulated that he knew and failed to disclose the following to potential investors and lenders:  (1) from July 2009 through October 2009, RRA was not providing the Banyon Group with fully executed settlement packages; (2) the independent third party was not completing the verification process set forth in the PPM for those settlement packages that had not been provided by RRA; and (3) Rothstein had failed to make payments to the Banyon Group and the Lender Group in April 2009 from the frozen trust accounts maintained at TD Bank.  D.E. 208-2 at 4; D.E. 199 ¶ 41.

### III.  LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion.

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the nonmoving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Poole*

*v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883

F.2d 923, 933 (11th Cir. 1989).

## IV.  DISCUSSION

The SEC moved for summary judgment on all counts alleged in its Amended Complaint,

and moved the Court to enter a permanent injunction, and moved for disgorgement and

prejudgment interest.  Defendant Preve cross-moved for summary judgment on all counts alleged

against him in the SEC's Amended Complaint, and Levin joined in his motion.  Instead of

addressing the motions individually, the Court will address the arguments raised in each motion

as it pertains to the particular count.

**A.      Count I - Sale of Unregistered Securities Under Sections 5(a) and 5(c) of the
         Securities Act**

The SEC alleges that Defendants violated Section 5 of the Securities Act of 1933 by

offering to sell the promissory notes for Banyon 1030-32 without filing a registration statement

with the SEC.

Section 5 of the Securities Act of 1933 prohibits the use of any means of interstate

commerce or the mails to offer to sell or offer to buy any security without having first filed a

registration statement with the SEC as to such security.  15 U.S.C. § 77e(a), (c); *United States v.

Custer Channel Wing Corp.*, 376 F.2d 675, 677 (4th Cir. 1967).  The Securities Act does,

however, "carefully exempt[s] from its application certain types of securities and securities

transactions where there is no practical need for its application or where the benefits are too

remote." *S.E.C. v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972) (citations

omitted).  The exemptions are enumerated in § 4 of the Securities Act and must be "narrowly

17

viewed since the Securities Act of 1933 is remedial legislation entitled to a broad construction." *Id.*

To establish a *prima facie* case for a § 5 violation, the SEC must prove three elements: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *Id.*

The parties contest the following issues as to the SEC's Section 5 claim: (1) whether the Banyon 1030-32 promissory notes are commercial paper under Section 3(a)(3) of the Securities Act and therefore exempt from registration requirements, *see* 15 U.S.C. § 77c(a)(3)[2]; (2) whether the notes are exempt from registration under Rule 506 of Regulation D, *see* 17 C.F.R. § 230.506; (3) whether the notes are exempt from registration under Rule 508, *see* 17 C.F.R. § 230.508; and (4) whether the notes are exempt from registration under the generic exemption of Section 4(2), *see* 15 U.S.C. § 77d(a)(2).

**(1)     Whether the Banyon 1030-32 Promissory Notes Are Exempt Under Section 3(a)(3)**

The Securities Act and the Exchange Act define security to mean "any note."  15 U.S.C. § 78c(a)(10); § 77b(1).  The phrase "'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts."  *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990).  Exempt from this definition are "any note . . . which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which

---

[2]Plaintiff states in its Reply that Defendants do not contest whether the Banyon notes are securities under this Section, but this argument is at least mentioned in Preve's Motion for Summary Judgment and Levin references this argument in foonote 3 of his response.

is likewise limited." 15 U.S.C. § 78c(a)(10); § 77c(a)(3).  The Supreme Court has adopted the "family resemblance" test to determine if a note is a security.  *Reves*, 494 U.S. at 65.  This starts with the presumption that "every note is a security," which "may be rebutted only by a showing that the note bears a strong resemblance . . . to one of the enumerated categories of instrument." *Id*. at 65-67.

In *Reves*, the Supreme Court listed four factors to determine whether the presumption is rebutted:  (1) the motivation that would prompt a reasonable seller and buyer to enter into the transaction; (2) the distribution plan of the instrument; (3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme that significantly reduces the risk of the instrument.  *Id.*

Defendants do not set forth an analysis as to why the Banyon promissory notes are not securities.  In Preve's Motion for Summary Judgment, he simply cites to a legal opinion stating that the notes are commercial paper under Section 3(a)(3).  D.E. 177 at 5;  *see* 15 U.S.C. § 77c(a)(3).  In Levin's footnote, he states that the "Notes are exempted securities under the Section 3(a)(3) exception for commercial paper."  D.E. 190 at 2 n.3.  Neither argument explains why the notes are not securities.  Going through the *Reves* analysis, it is clear there is no dispute of material fact that the Banyon notes are securities.

Under the first factor iterated in *Reves*, "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'"  *Reves*, 494 U.S. at 66.  "If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance

some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'" *Id.*  Here, Levin and Preve agree that the Banyon notes were used to finance substantial settlement purchases.  D.E. 199 ¶¶ 9, 17.  The buyers received a high fixed interest rate on the notes, thus receiving a large return on their investment.  D.E. 176-1 ¶ 30.  The buyers received no other benefit from investing in Banyon.

Under the second factor, the issue is whether Banyon's distribution plan constituted a common trading for speculation or investment.  *Reves*, 494 U.S. at 66.  The notes here were sold to at least 83 different investors in at least 6 different states.  D.E. 175 ¶ 10; D.E. 176-1 ¶ 57.  That the notes were sold to a number of investors in different states indicates that the notes are securities.  *See S.E.C. v. AIC, Inc.*, No. 3:11-cv-176, 2013 WL 5134411, at *11 (E.D. Tenn. Sept. 12, 2013).

Third, the Court examines the reasonable expectation of the investing public to see if the public views the notes as securities.  *Reves*, 494 U.S. at 66.  The notes were described in PowerPoint presentations as a "low risk investment strategy," and investors were promised a high interest rate on their investment, which was personally guaranteed by Levin.  D.E. 199 ¶ 20; D.E. 176-1 ¶ 30.  Accordingly, the public would reasonably view these notes as securities.

Fourth, there is no other regulatory scheme that reduces the risk of these notes.  Accordingly, under the *Reves* factors, the notes are most properly viewed as securities.

Further, any argument that these notes are commercial paper under either 15 U.S.C. § 77c(a)(3) or § 78c(a)(10) also fails.  The Supreme Court in *Reves* did not address how the family resemblance analysis should be applied to short-term notes.  *Reves*, 494 U.S. at 65 n.3.  The Fifth Circuit held in 1973 that:

> This exemption was intended by Congress to cover that type of commercial paper available for discount at a Federal Reserve Bank, not generally sold to the public or advertised for public sale. It applies only to such notes, usually high quality commercial paper, as arise out of current transactions and are hence covered by assets readily convertible into cash. The exemption does not apply to common capital stock or an instrument which has the characteristics of such stock generally, regardless of what other characteristics it may have. This charge did not give a more restrictive interpretation to the term "any note" and to the ambit of the note exemption than Congress intended.

*United States v. Rachal*, 473 F.2d 1338, 1343 (5th Cir. 1973).

*Reves* defines commercial paper to be "short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors." 494 U.S. at 70. The notes, as described above, are not commercial paper. They were not high quality investments, they were sold to the general public, and they did not arise out of current transactions. Instead, the notes were used to purchase settlement agreements at a discount and to provide investors with returns consistent with high risk instruments. It does not matter that the notes had an initial term of six months - the notes are not commercial paper. Accordingly, there is no dispute that these notes are securities as defined by the Securities Act and the Exchange Act.

**(2)      Whether the Notes Are Exempt from Registration Under Rule 506 of Regulation D**

Levin maintains nonetheless that the notes were exempt from registration under Rule 506 of Regulation D. *See* 17 C.F.R. § 230.506. As an initial matter, the Court must address which party bears the burden of proof regarding any affirmative defense. The SEC argues that after establishing a *prima facie* case on summary judgment, the burden shifts to Defendants to establish that an exemption from registration applies. Levin argues that the burden of proof on summary judgment remains with the SEC to show that there is no material issue of genuine fact as to his affirmative defense of exemption. It is true that, at trial, Levin will bear the burden of

proving that an exemption applies to the Banyon promissory notes.  At summary judgment, however, it is the SEC's burden to demonstrate that "there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Accordingly, the SEC cannot simply set forth a *prima facie* case in its opening brief, and then set forth additional arguments in its reply brief that there is an absence of evidence to support Levin's defense.

Under 15 U.S.C. § 77d(a)(2), transactions not involving any public offering are exempt from the registration requirements of Section 5.  Regulation D and Rule 506 implement this statutory exception.  17 C.F.R. § 230.506.  To meet the conditions of Rule 506, an offer or sale must satisfy the terms of Rule 501 and 502, and the issuer must reasonably believe that there are no more than 35 purchasers of securities.  17 C.F.R. § 230.506(b)(1), (2)(i).  Further:

> Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description.

17 C.F.R. § 230.506(b)(2)(ii).  Under Rule 501(e), accredited investors are not counted toward the 35 purchasers.  17 C.F.R. § 230.501(e).

### i.      *Arguments raised in the SEC's motion*

The SEC argues that the offering of the Banyon notes was not exempt from registration requirements pursuant to Rule 506(b)(2)(ii) because there were at least two investors, Julie Haefner and Micheal Toy, who were not qualified.  They have each provided declarations stating they were not accredited investors, and that they did not have the knowledge and experience in

financial and business matters to be capable of evaluating the merits and risks of the prospective investment. D.E. 172-17; D.E. 172-18.

In his response, Levin argues that Michael Toy previously executed and submitted an Investor Certification to Banyon, in which he confirmed he was an accredited investor because he had a net worth of over $1,000,000, and that he cannot now disavow this representation.[3]  Levin originally filed an investor certification that he claimed was completed by Michael Toy, but Levin then discovered that this was not the correct investor certification.  D.E. 192 ¶ 3.  Levin subsequently filed an investor certification containing what appears to be Toy's signature. *Compare* D.E. 190-20 at 4-5 *with* D.E. 192.

Levin also submitted with his Response an additional declaration from Haefner where she declares that she and her husband "carefully examined the terms of the investment, including the Note itself and the corresponding security agreement and personal guarantee provided by George Levin" before investing in Banyon.  D.E. 190-31 ¶ 4.  She further declares that "[a]t the time that we invested, my husband and I were fully capable of assessing the merits and risks of investing in the Note and loaning money to Banyon."  *Id.* ¶ 6.

In its Reply, the SEC submits a second declaration from Michael Toy in which he declares that although he may have signed an Investor Certification, he did not fill out page 1 of the investor certification representing that he had more than $1,000,000 in assets.  D.E. 208-3 ¶ 7.  Further, he declares that at the time of his investment, he was a bartender with an annual income less than $200,000.  *Id.* ¶ 8.  In the response to Levin's additional facts concerning the

---

[3] Levin also filed a Motion for an Order to Show Cause arguing that the Toy declaration submitted by the SEC was false and constituted bad faith litigation.  The Court addresses that Motion below.

Toy investor certification, the SEC argues that the certification with Toy's signature is unauthenticated and inadmissible hearsay.  D.E. 208-1 ¶ 221.  The SEC does not address Levin's arguments regarding the Haefner declaration in its Reply, and appears to recognize that her subsequent declaration submitted with Levin's response at least creates an issue of fact as to whether she qualified under Rule 506(b)(2)(ii).

"On motions for summary judgment, a court may consider only that evidence which can be reduced to an admissible form."  *Snover v. City of Starke, Fla.*, 398 F. App'x 445, 449 (11th Cir. 2010) (internal quotations and citations omitted).  "Authentication is a condition precedent to admissibility."  *Id.* (internal quotations omitted).  Levin submitted the Toy Investor Certification with the Declaration of Michael Pineiro, Levin's attorney as of August 11.  In Pineiro's declaration, he states that the production logs indicate that "Mr. Toy's investor certification (Ex. 1) was produced by Mr. Levin to the SEC, and that the SEC produced the document to Mr. Levin on two separate occasions."  D.E. 192 ¶ 4.  At no point, however, has anyone authenticated that this certification.  It also is not apparent that the certification will be readily admissible at trial, especially given Toy's declaration disputing the authenticity of the investor certification.  Accordingly, the Court will not consider the investor certification allegedly signed by Toy at summary judgment.  *See Snover*, 398 F. App'x at 449 ("Because the defendants merely filed the DVD with the court and did not authenticate it, the district court did not abuse its discretion in declining to consider the DVD.").

Without the investor certification, the evidence before the Court regarding whether Toy satisfied the requirements of Rule 506(b)(2)(ii) are the multiple declarations that the SEC has submitted with its briefing.  In these declarations, Toy swears that he does not consider himself a

sophisticated investor, he was not required to give any - nor did Defendants ask for any - information relating to previous financial experience prior to investing in Banyon, and he did not consult with an investment advisor or securities professional when deciding to invest in Banyon. D.E. 172-17 ¶¶ 13, 14, 16. He further declares that he was a bartender at the time he invested in Banyon, his annual income was less than $200,000, and his does not have a total amount of assets over $1,000,000. *Id.* ¶¶ 19, 20. Accordingly, there is no dispute of genuine fact that Toy did not qualify and that therefore Defendants cannot meet the requirement under Rule 506(b)(2)(ii) that *each* purchaser either have "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment," nor can they show they reasonably believed that each purchase came within this description because the undisputed admissible evidence shows they never made any such inquiry of Mr. Toy.

ii.    *Arguments Raised in Preve's Motion*

Preve summarily argues in his motion that the Banyon notes are exempt under Rule 506 of Regulation D. In response, the SEC argues that it is entitled to summary judgment on Defendants' Rule 506 defense because Defendants cannot meet their burden of proving an exemption applies for the following reasons: (1) Defendants cannot meet the evidentiary burden to show that only 35 non-accredited investors purchased notes; (2) Defendants cannot satisfy the requirements of Rule 506(b)(2)(ii) for the reasons advanced in the SEC's motion for summary judgment; and (3) Defendants cannot meet the burden to show they satisfied the requirements of Rule 502(b). In reply, Levin argues that the Court should strike the SEC's arguments for being

improper under Rule 56(f)(1) and that there are material issues of fact regarding the application of Rule 506.

For the reasons stated above in Section A.3.i, there is no dispute that Defendants cannot show that it met all of the requirements of Rule 506(b)(2)(ii).  As the SEC's remaining arguments should have been raised in its own motion for summary judgment, the Court will not address those here.  *See Celotex Corp.*, 477 U.S. at 325 ("Instead, as we have explained, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."); *Johnson v. State Farm Fire & Cas. Co.*, No. 12-00534-N, 2013 WL 4607548, at *1 n.5 (S.D. Ala. Aug. 29, 2013) ("Rule 56(f)(1) is a tool to be used by the Court, and *is not a substitute for filing a motion for, or crossmotion to, summary judgment*." (emphasis in original)).  To the extent the SEC's arguments are relevant to Defendants' Rule 508 defense, the Court will address them below.

### (3)       Whether the Notes are Exempt from Registration Under Rule 508

In his Response to the SEC's motion, Levin argues that the Banyon notes are exempt from registration under Rule 508 because any failure to comply with Rule 506 is insignificant and Defendants made a good faith effort under 508(a)(3) to comply with all applicable terms, conditions and requirements of Rule 506.  *See* 17 C.F.R. § 230.508.

Rule 508 provides a safe harbor for "insignificant deviations" from the specific requirements of Regulation D if there was a good faith effort to comply with Rule 506 and other conditions are met.  17 C.F.R. § 230.508.  Rule 508 provides that a person may demonstrate he is entitled to an exemption from registration under Rule 506, even if that person fails to comply with a requirement of Rule 506, if that person shows the following:  "(1) The failure to comply

26

did not pertain to a term, condition or requirement directly intended to protect that particular

individual or entity; and (2) The failure to comply was insignificant with respect to the offering

as a whole, provided that any failure to comply with paragraph (c) of § 230.502, paragraph (b)(2)

of § 230.504, paragraphs (b)(2)(i) and (ii) of § 230.505 and paragraph (b)(2)(i) of § 230.506 shall

be deemed to be significant to the offering as a whole; and (3) A good faith and reasonable

attempt was made to comply with all applicable terms, conditions and requirements of § 230.504,

§ 230.505 or § 230.506." *Id.* § 230.508(a).

The SEC argues pursuant to Rule 508(a)(2) that Defendants cannot rely on Rule 508

because they engaged in a general solicitation under Rule 502(c)[4], and because Defendants will

be unable to prove at trial that they complied with the requirements of Rule 506(b)(2)(i).

Noncompliance with either of these provisions is deemed a significant deviation from the

requirements of Regulation D and would prevent Defendants from relying on Rule 508.  *See* 17

C.F.R. § 230.508(a)(2).  The SEC further argues that the evidence Defendants rely on to establish

a good faith and reasonable attempt is inadmissible.  The Court finds that there are genuine

issues of material fact as to whether Defendants can claim exemption under Rule 508.

The following evidence demonstrates a genuine issue of material fact with regards to:

(1) whether there was a general solicitation under Rule 502(c); (2) whether Defendants complied

---

[4] Rule 502(c) provides that no exemption is available where an issuer of securities, or any person
acting on the issuer's behalf offers securities by general solicitation.  17 C.F.R. § 230.502(c).
This includes "(1) Any advertisement, article, notice or other communication published in any
newspaper, magazine, or similar media or broadcast over television or radio; and (2) Any
seminar or meeting whose attendees have been invited by any general solicitation or general
advertising."  *Id.*  "As a general rule, an offering tends to become public 'when the promoters
begin to bring in a diverse group of uninformed friends, neighbors and associates.'" *S.E.C. v.
Mattera*, No. 11 Civ. 8323(PKC), 2013 WL 6485949, at *11 (S.D.N.Y. Dec. 9, 2013) (quoting
*Nonpublic Offering Exemption,* 1933 Act Release No. 33–4552, 27 Fed.Reg. 11316 (Nov. 6,
1962)).

with Rule 506(b)(2)(i) that there be no more than 35 unaccredited investors; and (3) whether

Defendants made a good faith effort to comply with Rule 506:

- There is no evidence that Defendants conducted any advertising for the Banyon notes.

- There is testimony that the initial investors became involved with Banyon via word of mouth and personal connections.  D.E. 172-21 at 69:8-70:9, 76:23-77:7.

- There is a spreadsheet that was certified by Preve, which he could authenticate at trial, regarding the number of accredited investors who invested with Banyon.  D.E. 174-5.

- There is testimony from Preve that Banyon attempted to comply with Rule 506 by obtaining a legal opinion in mid-2008[5] when Banyon began receiving investments from individuals that were not family, friends, or acquaintances.  D.E. 187-30 at 82:14-87:12.

- One of the exhibits to the Toy declaration submitted with the SEC's opening brief is described as the Banyon 1030-32, Private Funding Offering.  D.E. 172-17 ¶ 10.  Part of this offering is a blank Investor Certification, identical to the certification that Levin argues Toy signed.  *Id.* at 7.  Although there is no evidence that Toy actually filled out an investor certification, the fact that it was included as part of the private funding offering given to him demonstrates Banyon's attempt to comply with Rule 506.

Collectively, this evidence creates an issue of fact for the jury to determine whether Defendants

can claim a registration exemption under Rule 508.  *See S.E.C. v. Ishopnomarkup.com, Inc.*, No.

04-cv-4057, 2007 WL 2782748, at *9 (E.D.N.Y. Sept. 24, 2007).

### (4)    Whether the Notes are Exempt Under Generic Section 4(2)

Levin also argues that if the Rule 506 exemption does not apply, then the Banyon notes

are exempt under the generic exemption set forth in Section 4(2), 15 U.S.C. § 77d(a)(2), which

provides that any transactions "not involving any public offering" are exempt from Section 5

registration requirements.  There are a number of enumerated factors to determine whether an

---

[5] The testimony saying that it was received in 2009 appears to be a typographical error as the date on the opinion is August 21, 2008.  D.E. 174-2.

offering is public or not:  "(1) the number of offerees and their relationship to each other and to the issuer; (2) the number of units offered; (3) the size of the offering;" and (4) the manner of the offering."  *Swenson v. Engelstad*, 626 F.2d 421, 425 (5th Cir. 1980) (internal citations and quotations omitted).  "Although this test appears to emphasize quantitative factors, the ultimate issue in determining the availability of the private offering exemption is whether the particular class of persons affected need the protection of the Act."  *Id.* (internal citations and quotations omitted).  "The defendant must establish that each and every offeree either had the same information that would have been available in a registration statement or had access to such information."  *Id.* at 425-26.

This defense is unavailable where a defendant cannot point to evidence showing the nature and extent of the information available to every offeree.  *See S.E.C. v. Life Partners, Inc.*, 912 F. Supp. 4, 10 (D.D.C. 1996) ("The party claiming the exemption must show that it is met not only with respect to each purchaser, but also with respect to each offeree."); *W. Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984) ("To claim the private offering exemption, evidence of the exact number and identity of all offerees must be produced.").

Neither Levin nor Preve explain how they will be able to provide such evidence as to each offeree.  Instead, Levin simply argues that "Banyon 1030 provided prospective purchasers of the notes with comprehensive materials regarding Banyon 1030."  D.E. 190 at 10. Defendants admit, however, that Banyon used at least three purchaser representatives to acquire outside lenders.  *Id.*  Defendants do not argue that they will be able to provide evidence or testimony regarding each offeree these representatives contacted.  Preve testified that he was "[n]ot at all" aware of what documents one purchaser representative, Curt Lyman, was providing

to his clients.  D.E. 172-14 at 428:5-7.  Levin testified that he could not remember which

individuals had brought in outside investors.  D.E. 172-27 at 309:5-14.  Accordingly, Defendants

have failed to show that there is a genuine dispute of material fact as to whether each offeree had

access to the same information that would have been available in a registration statement, and

this defense is unavailable to Defendants.

**B.      Counts II - IV - Fraud in Violation of Sections 17(a)(1), (a)(2), and (a)(3) of the Securities Act and Fraud in Violation of Section 10(b) of the Exchange Act**

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities.  15

U.S.C. § 77q(a).  Section 10(b) of the Exchange Act and Rule 10b-5 prohibits fraud in

connection with the purchase or sale of securities.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

To establish a cause of action under Section 17(a)(1), 15 U.S.C. § 77q(a)(1), Plaintiff

must prove the following: "(1) material misrepresentations or materially misleading omissions,

(2) in the offer or sale of securities, (3) made with scienter." *S.E.C. v. Monterosso*, 756 F.3d

1326, 1334 (11th Cir. 2014) (internal citations and quotations omitted).  "To show a violation of

section 17(a)(2) or 17(a)(3), the SEC need only demonstrate (1) material misrepresentations or

materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence."

*Id.*  "In order to establish a section 10(b) or Rule 10b-5 violation, the SEC must prove (1) a

material misrepresentation or materially misleading omission; (2) in connection with the

purchase or sale of securities; (3) made with scienter."  *Id.* at 1333-34.  Unlike a private litigant

the SEC need not prove reliance, causation, or damages. *S.E.C. v. Morgan Keegan & Co., Inc.*,

678 F.3d 1233, 1244 (11th Cir. 2012).

The SEC argues that Defendants did the following: (1) misrepresented that settlements

were fully funded prior to investment; (2) misrepresented that Banyon had in its possession all

settlement documentation prior to investment; (3) failed to disclose that Rothstein froze his

accounts and failed to make complete payments to Banyon as of April 2009; (4) misrepresented

the success of Banyon 1030-32; (5) misrepresented guaranteed annual returns; (6) misrepresented

BIF's receipt of funds; and (7) misrepresented whether the independent verifier had reviewed the

settlement package.  Plaintiff contends that as a matter of law, these misrepresentations and

omissions are material.  Plaintiff also contends that there is no question of fact that Defendants

acted with the requisite scienter and negligence to be found liable.  Finally, Plaintiff states that

these misrepresentations satisfy the "in connection with" language of Section 10(b), and that the

securities were sold through interstate commerce.

Defendants respond that, generally, materiality, scienter, and negligence are typically

questions for the jury.  Defendant Levin then walks through each alleged misrepresentation and

argues that he (1) did not make these misrepresentation or omissions, (2) these

misrepresentations or omissions are not material, and (3) that he did not act with the requisite

scienter or negligence.

**(1)      Materiality of Omissions/Misrepresentations**

The first issue that must be determined for all securities fraud claims alleged is whether

the alleged misrepresentations or omissions were material.  "The test for materiality in the

securities fraud context is 'whether a reasonable man would attach importance to the fact

misrepresented or omitted in determining his course of action.'"  *S.E.C. v. Goble*, 682 F.3d 934,

943 (11th Cir. 2012) (quoting *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir.

2007)).  "In other words, a misrepresentation or omission is material if there is a 'substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available.'" *Morgan Keegan & Co.*, 678 F.3d at 1245 (quoting *T.S.C. Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  In the Eleventh Circuit materiality is considered at least a mixed question of law and fact involving "assessments peculiarly within the province of the trier of fact." *Merch. Capital*, 483 F.3d at 766.

"Summary judgment is appropriate where the misstatement is 'so obviously important to an investor that reasonable minds cannot differ on the question of materiality.'" *S.E.C. v. Monterosso*, 768 F. Supp. 2d 1244, 1263 (S.D. Fla. 2011) (quoting *TSC Indus., Inc.*, 426 U.S. at 450).  "[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Id.* (internal quotations and citations omitted).

Courts have found that misrepresentations or omissions are material as a matter of law where the representations are related to the revenue of a particular investment, how an investor's funds are being used, or the risk of a particular investment.  *Monterosso*, 768 F. Supp. 2d. at 1263 ("The Court finds that the overstatements of revenue in this case would be so obviously important to an investor that there are no genuine issues of fact concerning the issue of materiality."); *S.E.C. v. Kirkland*, 521 F. Supp. 2d 1281, 1303 (M.D. Fla. 2007) ("All of this information is material to potential investors because it is directly tied to the level of risk associated with the investment"); *S.E.C. v. Persaud*, No. 6:12-cv-932, 2013 WL 6478800, at *5 (M.D. Fla. Dec. 10, 2013) ("There is a substantial likelihood that a reasonable investor would find that Mr. Persaud's disclosure of his true trading strategies, the use of the investment funds, and the risk of the investment would significantly alter the total mix of information made available.").

The SEC argues that the alleged misrepresentations and omissions are material because "clearly any reasonable investor would have wanted to know that Banyon was not the successful company Levin and Preve claimed it was, Rothstein had frozen payments to Banyon, Banyon was not following the safety procedures it promised by purchasing investments without any documentation or proof of settlements or settlement funds and failing to verify the statements even existed."  D.E. 176 at 27-28.

Although the SEC lists seven different misrepresentations, upon closer inspection, there are actually only four pieces of information that the SEC alleges were either misrepresented or omitted:  (1) that Rothstein was frequently unable to provide complete documentation for settlement agreements that Banyon and BIF had already purchased, and for the last three to four months of the Ponzi scheme's operation, absolutely no document packages were provided; (2) that some settlement agreements were not fully funded prior to BIF investing in them; (3) that the third party independent verifier had not reviewed the purchased settlement agreements as of July 2009 because he had not received any document packages; and (4) that the Banyon funds were frozen as of April 2009, when Rothstein said he was experiencing issues with the Florida Bar, and that there was no clear point when the funds would be unfrozen.  These misrepresentations or omissions were allegedly conveyed via three avenues: (1) PowerPoints distributed or presented to potential investors; (2) meetings with potential investors; and (3) in the BIF PPM.

Levin argues that these pieces of information are not material for a number of reasons, including:  (1) any delay in confirming that certain settlements were fully funded prior to investing was brief; (2) Levin and Preve frequently checked to ensure that the Banyon trust accounts had sufficient funds to cover their investments, even if the funds were frozen; (3) Levin

had personally guaranteed all Banyon promissory notes; (4) delays in receiving document

packages were simply minor deviations and Rothstein almost always provided a document

package shortly after a settlement was purchased; (5) many individuals had performed due

diligence regarding Rothstein's settlement business; (6) the Banyon entities did not miss any

payments due to note holders; and (7) the BIF PPM contained cautionary language warning

investors about the risk of any investment.

   The Court finds that, alone, the information regarding Rothstein's bar issues and his

freezing the Banyon trust accounts would be so obviously important to an investor that there are

no genuine issues of fact concerning the issue of materiality.  Even assuming that it was true that

the Banyon trust accounts had sufficient funds to cover any exposure to investors, a reasonable

investor would certainly attach importance to the fact that he could not access his funds, nor

could he be given a time when he would be able to access his funds.  A reasonable investor

would also attach significant importance to the fact that RRA owed Banyon, as of May 2009,

over $100 million in past due funds.  This is especially true given the statements in the PPM

promising specific returns.  D.E. 172-26 at 9; *Merch. Capital*, 483 F.3d at 768 ("It is well

established that a materially misleading omission of past performance information occurs when a

promoter makes optimistic statements about the prospects of the business but fails to include past

performance information that would be useful to a reasonable investor in assessing those

statements.").

   The emails exchanged between Preve, Rothstein, and Levin, indicate that they recognized

the importance of this information:  "[C]oncerned?  I am petrified . . . if word ever gets out that

we are $125m past due we will never see another cent in 3rd party fundings including the PPM . .

. The fact that I am concerned that 25% of our portfolio is past due should not come as a surprise to you," D.E. 172-42[6]; "it could have very large negative consequences if word gets out in the marketplace that any payments have been held up for any reason," D.E. 172-60; "How much in $$$$ are we owed now> As of Sep first! All of it will be due soon," D.E. 172-28.

The other three categories of misrepresented or omitted information regarding the procedural requirements for purchasing settlements are also material because a reasonable investor would have found this information important.  Banyon represented that ensuring settlement funds were received by the trust account before purchasing a settlement agreement, and receiving all executed documents necessary prior to disbursing funds, were "Risk Mitigation" steps.  D.E. 172-32 at 51.  The BIF PPM contained similar representations.  D.E. 172-26 at 18-19.  Banyon was therefore not following its own risk mitigation steps despite representations to potential investors.  As cited above, misrepresentations regarding the risk of a particular investment are material because a reasonable investor would attach importance to this information.  *See Kirkland*, 521 F. Supp. 2d at 1303.

Although a minor deviation in following document exchange procedures – for example, if Rothstein did not provide a few documents for a small percentage of the settlement agreements prior to Banyon funding the settlement agreement – may not be material by itself, there is no dispute that these were minor deviations from set procedures.  For the final four months of Rothstein's scheme, he provided almost no document packages for the settlement agreements Banyon and BIF purchased, and, as a result, independent verification never occurred.  There are

---

[6] Defendant Levin objects to this email being unauthenticated, but Preve testified about this email in his deposition, D.E. 172-5 at 393:7-395:2, and Levin stipulated to the authenticity of any email that is "to or from Frank Preve or to or from Levin or that they're copied on," D.E. 172-27 at 301:-9-302:6, D.E. 176-1 & D.E. 190-1 ¶ 1.

multiple emails from Preve to Rothstein where Preve indicates his discomfort in not having

document packages:

- "I really need the backup documentation . . . I don't mind going ONE week without it but going a MONTH is asking for an enlightened attitude which I was just not blessed with . . ." D.E. 172-39 at 3.

- "I cannot live another day without having the G-B1/G-B2 deal paperwork . . . $3.5M is serious coin." *Id.* at 4.

- "Ok … I admit it . . . you are doing a god job . . . NOW if you could only get me the copies of deals G-54 – G-60 and G-63-G-66 . . . how wonderful would that be??  Our auditors start on our books next Monday . . . it will be very embarrassing if I have 15 blank files." *Id.* at 8.

- "Right now the BIF docs are all saying the funds are in the Banyon Investment account (0923) which is also wrong and will get us in a lot of trouble down the road." D.E. 172-40.

- "Can we at least get the documents for the monies that have been sent so if we do have public scrutiny over the BIF books we have things balanced rather than the cavernous hole that I have allowed to be created????" D.E. 172-48

- "Larry [Roven of BIF] is coming down on Monday to do an internal audit . . . my half-ass is significantly exposed here because we are not following protocol in terms of the paperwork nor Mike's inspections.  We need to get these two done pronto to avoid serious repercussions."  D.E. 172-58 at 2.

- "The Szafranski issue [independent verification] is killing me with Larry – we have to resolve it right now or this whole thing will blow up"  D.E. 172-59

Accordingly, the misrepresentations and omissions regarding the problems in receiving

settlement funds, complying with documentation exchange procedures, and verifying the

settlement agreements were material because they are tied to the level of risk associated with

each investment.

Levin argues that the bespeak caution doctrine renders misrepresentations contained in

the PPM immaterial because the PPM included certain risk disclosures.  The bespeaks caution

doctrine provides that meaningful cautionary statements and specific warnings of the risks

involved may be sufficient to render the alleged omissions or misrepresentations immaterial as a

matter of law.  *Merch. Capital*, 483 F.3d at 767.  The cautionary language contained in the PPM,

however, is simply a list of "certain risk factors," which are largely boilerplate warnings and do

not warn about the specific issues addressed above.  *See* D.E. 172-26 at 13-18.  "[G]eneral

cautionary language does not render omission of specific adverse historical facts immaterial."

*Merch. Capital*, 483 F.3d at 768.

> **(2)    Levin's Liability as "Maker" of a Statement Under Section 10(b) and Rule 10b-5**

Levin argues that he cannot be held liable under Section 10(b) and Rule 10b-5 because he

did not prepare Banyon's PowerPoint presentation, he did not have substantive conversations

with prospective investors, and he did not prepare or have ultimate authority over the content of

the PPM.  *See* 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person . . . by the use of any

means or instrumentality of interstate commerce . . . (b) To **make** any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading." (emphasis added)).

"For purposes of Rule 10b–5, the maker of a statement is the person or entity with

ultimate authority over the statement, including its content and whether and how to communicate

it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).[7]  The

Supreme Court "analogized a person who contributes to the content of a securities statement but

---

[7] The Eleventh Circuit has found that this requirement under Section 10(b) does not apply to violations alleged under Section 17(a). *See S.E.C. v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("*Janus* only discussed what it means to 'make' a statement for purposes of Rule 10b–5(b), and did not concern section 17(a)(1) or (3) or Rule 10b–5(a) or (c). *See Janus,* 131 S.Ct. at 2299–302. The operative language of section 17(a) does not require a defendant to 'make' a statement in order to be liable. *See* 15 U.S.C. § 77q. Likewise, subsections (a) and (c) of Rule 10b–5 are not so restricted as subsection (b), because they are not limited to the making of an untrue statement of a material fact." (internal citations and quotations omitted)).

does not control what information is ultimately included in the statement and a speechwriter, on the one hand, and similarly analogized a person or entity with ultimately authority over the statement and the person who delivers the speech, on the other, distinguishing the roles of contributor and content authorizer." D.E. 113 at 26. "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said." *Janus Capital Grp.*, 131 S. Ct. at 2302.

The SEC argues that Levin should be held liable because he is the person having "ultimate authority over the statements in the PowerPoint and PPM." D.E. 208 at 16. Levin stipulated that, as the managing member of Banyon 1030-32, he had "ultimate authority over the content of the PowerPoint presentations." D.E. 199 ¶ 23. Levin also stipulated that "[a]s the managing member of Banyon 1030-32, Levin had ultimate authority over the operations and statements of Banyon Income Fund." *Id.* ¶ 35.

Based on these stipulations, there is no question of fact that Levin can be held liable as the maker of the alleged misrepresentations because he had the requisite control and authority over the statements that the Banyon entities made. "In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012). Accordingly, even if Levin had very little involvement in the content of the PowerPoint presentations, or the PPM, he, as the person wielding control over what the statements Banyon and BIF made, may be held liable under *Janus*.

**(3)    Scienter**

To establish a violation of either Section 10(b) or Section 17(a)(1), the SEC must

establish that Defendants acted with the requisite scienter.  15 U.S.C. §§ 77q(a)(1), 78j(b).

> Scienter may be established by a showing of knowing misconduct or severe
> recklessness. Proof of recklessness requires a showing that the defendant's
> conduct was an extreme departure of the standards of ordinary care, which
> presents a danger of misleading buyers or sellers that is either known to the
> defendant or is so obvious that the actor must have been aware of it.

*Monterosso*, 756 F.3d at 1335 (internal quotations and citations omitted).  "While scienter is an

issue ordinarily left to a trier of fact, there are cases in which summary judgment may be

appropriate."  *Id.*  The Court finds that there is a dispute as to whether Levin acted with the

requisite scienter.

There are a number of facts that raise a dispute as to whether Levin acted with the

requisite scienter.  These facts include the following:  (1) Levin testified that he did not have

substantial contact with Banyon investors, and that he had no contact with BIF investors, D.E.

172-27 at 265:3-266:12, 281:8-17, 285:4-16; D.E. 190-1 ¶¶ 290, 291; (2) he was not involved in

the day-to-day operations of the Banyon entities, and delegated a lot of authority to Preve, *see,*

*e.g.*, D.E. 172-21 at 63:4-18; D.E. 172-6, 40:16-41:7; (3) he had a good faith belief that there

were sufficient funds in Banyons' trust accounts to cover any investor exposure, *see, e.g.*, D.E.

172-27 at 149:7-150:11; (4) a number of individuals performed due diligence on Banyon and

Rothstein, *see, e.g.*, D.E. 172-27 at 205:8-13; (5) he testified that he told Bekkedam prior to

BIF's formation that Rothstein was experiencing problems with the Florida Bar, D.E. 172-21 at

308:8-311:14; D.E. 172-27 at 243:14-249:19; (6) he spent the majority of his time from June

2009 through October 2009 in the Virgin Islands, D.E. 172-21 at 287:8-288:14, 294:7-295:21;

(7) he was only occasionally aware of documentation problems, D.E. 172-6 at 90:12-24, 118:19-

119:14; and (8) there are a number of emails indicating that Preve did not keep Levin fully

informed as to the operation of the Banyon entities, D.E. 190-20 at 10-14.

       **(4)**     **Negligence**

      To show a violation of Sections 17(a)(2) or 17(a)(3), the SEC need only prove that

Defendants acted negligently.  15 U.S.C. § 77q(a)(2), (3).  There are, however, questions of fact

as to whether Levin can be found negligent for substantially the same reasons as those discussed

above.

**C.**     **Counts V - VI - Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b)
of the Exchange Act**

      "For aiding and abetting liability under the federal securities laws, three elements must be

established: (1) a primary or independent securities law violation committed by another party; (2)

awareness or knowledge by the aider and abettor that his or her role was part of an overall

activity that was improper; also conceptualized as scienter in aiding and abetting antifraud

violations; and (3) that the aider and abettor knowingly and substantially assisted the conduct that

constitutes the violation."  *S.E.C. v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1306 (S.D. Fla.

2007).  For the same reasons as those stated above regarding Levin's scienter, the Court cannot

grant summary judgment as to Count VI against Levin.

**D.**     **Whether the Court Should Award the Requested Remedies**

      This section of the SEC's brief seems like a bit of an afterthought, as indicated by the

Commission's failure to include the amount Preve supposedly admitted he made in salary and

profits.  The SEC requests that the Court enter a permanent injunction, and order disgorgement

and prejudgment interest.  The Court, however, cannot enter any relief with respect to Levin as

the Court has found there are questions of fact regarding whether he is liable for any securities

violation.

## V.  LEVIN'S MOTION FOR AN ORDER TO SHOW CAUSE

Levin has also filed a separate Motion for an Order to Show Cause arguing that the SEC

received a production copy of Michael Toy's Investor Certification on April 8, 2013, and that the

SEC obtained a false declaration from Mr. Toy to support its Motion for Summary Judgment.

Levin also argues that the SEC never explained to Ms. Haefner "what it meant to be a

'sophisticated investor'" and her declaration "appears to have been obtained through the

omission of crucial information."  D.E. 194 at 4, 5.  Levin argues that sanctions should be

imposed against the SEC for submitting "false and manipulated declarations."  D.E. 194 at 5.

In response to Levin's motion to impose sanctions, the SEC argues that the purported

investor certification produced during discovery had a redacted signature line.  *See* D.E. 212-3 at

5.  Upon further investigation, the SEC determined that the first investor certification was not

Michael Toy's, but that there was a different investor certification that did contain Toy's

signature.  *See* D.E. 212-6 at 5.  The SEC contacted Toy who swore that he had never signed an

out an investor certification, Defendants never asked Toy any questions about his financial status

before he invested in Banyon, and offered to provide another declaration explaining these facts.

D.E. 212 at 3.  The SEC advised Levin of these conversations with Toy, and Levin's counsel

stated he was going to file the motion anyway.  *Id.*

Regarding the Haefner declaration, the SEC argues that taking the facts as alleged to be

truthful, they still do not amount to witness manipulation.  Also, the SEC states that "[r]egardless

of Haeffner's assumptions of a sophisticated investor, her June 2014 declaration sets forth the

41

facts showing she was not one." D.E. 212 at 6.

The Court has an inherent power to impose sanctions if it finds a party has litigated in bad faith. *Qantum Commc'ns Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249, 1268 (S.D. Fla. 2007). The Court finds that the SEC has not litigated in bad faith. Mr. Toy has submitted multiple declarations that support the SEC's arguments and show that the SEC has not submitted perjured testimony. Accordingly, Mr. Levin's Motion for an Order to Show Cause will be DENIED.

## VI. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Defendant Frank Preve's Motion, D.E. 177, is DENIED. It is further

ORDERED AND ADJUDGED that Defendant George Levin's Motion, D.E. 194, is DENIED. It is further

ORDERED AND ADJDUGED that Plaintiff's Motion, D.E. 176, is GRANTED IN PART and DENIED IN PART. It is GRANTED as follows:

(1) Plaintiff's Motion (D.E. 176) is granted as to Defendants' affirmative defense that the Banyon 1030-32 promissory notes were not securities under 15 U.S.C. § 77c(a)(3);

(3) Plaintiff's Motion (D.E. 176) is granted as to Defendants' affirmative defense that the Banyon 1030-32 promissory notes were exempt under generic Section 4(2) of the Securities Act.

Plaintiff's Motion is otherwise DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 6th  day of October, 2014.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided: counsel of record